**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GLOBAL WOUND CARE MEDICAL GROUP, a Professional Corporation,[1]<br><br>Debtor and Debtor in Possession. | Chapter 11<br><br>Case No. 24-34908 |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 (I) AUTHORIZING AND APPROVING THE SETTLEMENT AGREEMENT WITH THE UNITED STATES AND RELATOR AND (II) GRANTING RELATED RELIEF**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Global Wound Care Medical Group, a Professional Corporation, the debtor and debtor in possession (the "Debtor") in the above-captioned Chapter 11[2] case (the "Case"), hereby moves (the "Motion") the United States Bankruptcy Court for the Southern District of Texas (the "Court"), pursuant to § 105 and Bankruptcy Rule 9019 for entry of an order, substantially in the form attached hereto as **Exhibit "A"** (the "Proposed Order"): (i) authorizing and approving the

---

1 The last four digits of the Debtor's tax identification number in the jurisdiction in which it operates are 3572.

2 Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); "Bankruptcy Rule" references are to the Federal Rule of Bankruptcy Procedure. "Local Rules" references are to the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas.

Debtor's entry into a settlement agreement (the "Settlement Agreement"), attached hereto as **Exhibit "B,"** with the United States of America, acting through the United States Department of Justice (the "DOJ") and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS"), the Defense Health Agency ("DHA"), acting on behalf of the TRICARE Program, the United States Department of Veterans Affairs (collectively with OIG-HHS, HHS, and DHA, the "United States"), [redacted] (the "Relator") (together, the Debtor, the United States, and the Relator are collectively referred to as the "Parties"); and (ii) granting related relief. In support of the Motion, the Debtor submits the *Declaration of Louis E. Robichaux IV in Support of Debtor's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 (I) Authorizing and Approving the Debtor's Settlement Agreement with the United States and Relator; and (II) Granting Related Relief* (the "Robichaux Declaration") and respectfully represents as follows:

## INTRODUCTION

1. This Motion requests approval of a comprehensive Settlement Agreement between the Debtor and the United States that resolves significant allegations, investigations, and litigation in which the United States asserted claims against the Debtor in excess of $1.5 billion based on violations of the False Claims Act ("the FCA") and related statutory, regulatory, and common law theories that led to the circumstances requiring the filing of this Case. The United States suspended payments to the Debtor based on these allegations, which led to the filing of this Case. After the filing of the Case, the Debtor negotiated a stipulation with the United States that partially lifted the suspension by authorizing payment of 75% of amounts owed to the Debtor while allowing the United States to continue to suspend 25% of the payments. By the spring of 2025, the Debtor had negotiated a tentative settlement of the Government Claims (defined *infra*) with the United States.

However, that settlement was not completed before the Centers for Medicare & Medicaid Services ("CMS") issued rules and a fee schedule, on October 31, 2025, that significantly reduced the reimbursements paid for the services provided by the Debtor. As a result, the Debtor made the difficult decision to cease operations by the end of December 2025. The United States' claim, however, remained, and, without resolution of it, the Debtor, among other things, faced an extraordinary sized claim and difficulty formulating a plan of reorganization.

2. The Debtor respectfully submits that the Settlement Agreement should be approved under Bankruptcy Rule 9019 and is fair, equitable and in the best interest of the estate. In considering the approval of the Settlement Agreement, the factors that Courts consider weigh in favor of the Settlement Agreement. Specifically, with regard to the probability of success, the United States has assembled substantial evidence supporting its claims, and, while the Debtor has defenses to the allegations, the proposed settlement provides a fair assessment of the litigation risk facing the Debtor. The Debtor would face treble damages and per-claim penalties in excess of $1.5 billion if it were to lose in litigation. With regard to complexity and expense, FCA litigation with the United States is inherently protracted, discovery-intensive, and expensive; the fees and costs of litigating three distinct theories of liability would deplete estate resources with no guarantee of a better outcome. With regard to collection difficulties, this factor is not relevant as typically applied because the Debtor does not assert claims against the United States and seek to collect on them. However, to the extent that the Debtor sought to recover amounts in the suspense account that total over $316 million, the Debtor is informed and believes that CMS is preparing a separate claim asserting hundreds of millions of dollars in Medicare overpayment claims not related to the Government Claims; those claims could arguably be asserted as a right of recoupment against the funds currently held in the suspense account. Thus, even if the Debtor were to prevail on issues

raised in connection with the Government Claims, it would then face another dispute over Medicare's recoupment rights over the same funds now held in the suspense account. Finally, this settlement is the product of extensive arm's-length negotiations and provides the only viable pathway to resolving the Government Claims, allowing the Debtor to confirm a liquidating plan of reorganization. and make a meaningful payment to creditors other than the United States.

3. Based on the foregoing, and as set forth more fully below, the Debtor respectfully submits that the Settlement Agreement is fair, equitable, and in the best interests of the Debtor's estate, and respectfully requests that the Court approve it.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and rule bases for the relief sought herein are § 105(a) and Bankruptcy Rule 9019.

## FACTUAL BACKGROUND

### A. General Background

5. On October 21, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11.

6. On the Petition Date, the Debtor operated a medical practice that provided wound care services, primarily to elderly patients who received Medicare. The Debtor was licensed in more than 20 states and had a team of over 200 wound care providers that treated over 2,000 wounds daily. The Debtor relied overwhelmingly on government healthcare programs for its revenue, with the Medicare and Medicaid programs providing the vast majority of its income for services provided to patients who rely on such programs for their health insurance coverage. *See*

*Declaration of Ralph Cetrulo in Support of Chapter 11 Petition and First Day Motions* [Docket No. 8] (the "First Day Declaration"), at ¶ 23.

7. The Debtor was, both pre- and postpetition, managed by Wound Pros Management Group, Inc. ("Wound Pros"), a management-services organization, pursuant to a Management Services Agreement (the "MSA"). . *Id.* at ¶ 16. Pursuant to the MSA, Wound Pros handled all of the Debtor's non-clinical, administrative, and business operations, including billing and collections, legal and regulatory compliance, and administrative and infrastructure support.

**B. The Dispute with the United States**

8. [redacted] which commenced a False Claims Act investigation by the Department of Justice (the "FCA Litigation"). In the FCA Litigation, it is alleged, among other things, that certain entities and individuals violated the FCA by submitting or causing the submission of (1) claims asserting that medical treatment had been provided by non-physician personnel "incident to" a physician's services when that was not correct, and (2) claims tainted by the debtors' payment of illegal remuneration, in this case improper "incentive" payments to independent contractor clinicians for the ordering, application, and billing of biologic skin substitutes. The United States alleges that the Debtor is liable for certain conduct alleged in the FCA Litigation, and that it enrolled in the Medicare program fraudulently by not disclosing affiliations with certain other entities and persons.

9. In sum, the DOJ alleges the conduct described above violated the FCA, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and related provisions of federal law. The United States,

acting through the DOJ and CMS, is prepared to assert claims exceeding $1.5 billion against the Debtor arising under these statutes and provisions (collectively, the "Government Claims").

10. On September 11, 2024, CMS, in consultation with the Office of the Inspector General of HHS, acting through Qlarant Integrity Solutions, LLC, a CMS Unified Program Integrity Contractor, notified the Debtor that its Medicare payments had been suspended (the "Payment Suspension") based on "credible allegations of fraud." First Day Declaration, at ¶ 28.

11. On October 11, 2024, the Debtor submitted a rebuttal letter contesting the Payment Suspension and disputing the allegations of fraud. However, the Payment Suspension represented an existential threat to the Debtor, and without the ability to obtain immediate relief from the Payment Suspension outside of bankruptcy, the Debtor commenced this Case.

**C. The Payment Suspension Stipulation and Postpetition Negotiations**

12. After the Petition Date, the United States and the Debtor engaged in negotiations concerning the Government Claims and the Payment Suspension. To facilitate continued negotiations regarding the Government Claims, and in exchange for certain protections, CMS partially and temporarily modified the Payment Suspension by entering into a stipulation with the Debtor, which was approved on December 19, 2024, when the Court approved the *Stipulation and Agreed Order Regarding Suspension of Medicare Payments to the Debtor by the United States Department of Health and Human Services* [Docket No. 87] (the "Payment Suspension Stipulation") (attached as **Exhibit "C"**). Among other things, the Payment Suspension Stipulation: (i) modified the Payment Suspension to continue the suspension as to 25% of amounts payable on claims submitted by the Debtor on or after the effective date and allow payment of 75% of such amounts to the Debtor; (ii) required appointment of a Chief Restructuring Officer ("CRO") to exercise executive authority over the Debtor's operations; (iii) required the Debtor to

adhere to a weekly Operating Budget; (iv) imposed cooperation and reporting obligations on the Debtor; and (v) provided the United States with certain adequate protection, including super-priority administrative claims and setoff rights. The Payment Suspension Stipulation further afforded the United States certain adequate protection of its interests in any Released Payments, including setoff rights against the Previously Suspended Payments, Continuing Suspended Payments, the Medicare Receivables Account, and any pre- or postpetition debts owed to the Debtor, as well as a super-priority administrative claim under section 507(b) and a first-priority perfected security interest in the Medicare Receivables Account.

13. The Payment Suspension Stipulation was extended multiple times by written agreement of the Parties. *See* Docket Nos. 95, 112, 119, 129, 141, 150, 154, 163, 171, 182, 194, 199, 203, 213, 228, 243, 255, 272, 323.[3]

14. The Payment Suspension Stipulation terminated by operation of its own terms on November 15, 2025. *See* Docket No. 323 at 2.

15. As of June 20, 2026, the amount of approved paid claims held in suspense by CMS is $316,752,545.74 (the "CMS Suspended Amount"). This amount will continue to accrue until the termination of the suspension. Additionally, beginning on or about May 13, 2025, DHA suspended TRICARE payments to the Debtor pursuant to 32 C.F.R. § 199.9(h) (the "TRICARE Suspension," and collectively with the Payment Suspension, the "Suspensions"). As of June 17, 2026, the amount of approved paid claims held in suspense by DHA is $1,106.08 (the "DHA Suspended Amount"). This amount will continue to accrue until the termination of the suspension.

[3] Pursuant to extensions agreed to by the Parties, the deadline for the United States to file a proof of claim has been extended to September 15, 2026. *See* Docket No. 433.

**D. The Debtor's Financial Distress in 2025**

16. Throughout 2025, the Debtor continued to operate under the Payment Suspension Stipulation. However, beginning in the late summer of 2025, Medicare Administrative Contractors dramatically increased the number of Additional Documentation Requests ("ADRs") issued to the Debtor. Whereas the Debtor received fewer than 50 ADRs in total between January and July 2025, by late September and October 2025, the Debtor was receiving as many as 50 ADRs per day. This surge in ADRs significantly impacted the Debtor's Medicare reimbursement timeline and cash flow.

17. By October 2025, the slowdown in Medicare reimbursements created an imminent threat to the Debtor's continued operations and the Debtor's cash on hand fell dramatically.

18. Then, at the end of October 2025, CMS finalized rules shifting most skin substitute products used by the Debtor to treat its patients (cellular and tissue-based products) away from the old average sales price plus 6% model and announced that, starting in January 2026, these products were re-categorized as "incident-to" supplies at a new flat, standardized rate of roughly $127 per square centimeter. *See* Centers for Medicare & Medicaid Services, *CMS Modernizes Payment Accuracy and Significantly Cuts Spending Waste*, available at https://www.cms.gov/newsroom/press-releases/cms-modernizes-payment-accuracy-significantly-cuts-spending-waste (Oct. 31, 2025) (last visited Aug. 29, 2026); E. Song and T. Hamm, *2026 CMS Rules for Skin Substitutes: Billing, Payment & Coverage FAQ*, available at https://woundreference.com/p/blog?id=skin-substitutes---whats-new-in-2026-frequently-asked-questions (updated Mar. 18, 2026) (last visited Aug. 29, 2026). As a result of this change, the Debtor's projected cash flow was reduced by 90%, making continued operations financially impossible, and so, in December 2025, the Debtor suspended operations and terminated the

employment of all of its employees other than the Chief Executive Officer and the Chief Restructuring Officer.

## E. The Settlement Negotiations and The Settlement Agreement[4]

19. Throughout the Case, the Debtor and the United States have engaged in extensive, arm's-length negotiations to resolve the Government Claims. The Settlement Agreement is the product of these good-faith negotiations between the Parties and their respective counsel and representatives.

20. The primary terms of the Settlement Agreement are described and set forth below (unless otherwise defined herein, all capitalized terms shall have the same meaning as in the Settlement Agreement):

a. **Settlement Payment.** Pursuant to the Settlement Agreement, the Debtor will pay to the United States up to $525 million (the "Settlement Amount"), of which $262.5 million is restitution. Payment of the Settlement Amount shall be satisfied as follows:

   i. the Debtor will forfeit all of the CMS Suspended Amount and the DHA Suspended Amount (the "Suspended Amounts") to the United States;

   ii. after the suspensions are terminated, CMS will deduct $10,123,400.35 plus interest from the CMS Suspended Amount to satisfy ordinary course overpayments;

   iii. the remainder of the Suspended Amounts will be applied to payment of the Settlement Amount;

   iv. any amounts paid to resolve FCA claims relating to the Covered Conduct by any creditor in the Bankruptcy Case prior to confirmation of the Plan shall be credited towards the Settlement Amount;

   v. the Debtor agrees that the United States shall have an allowed, nondischargeable, super-priority claim for the unpaid balance; and

[4] To the extent the summary or any other description of the Settlement Agreement in the Motion conflicts with the actual terms of the Settlement Agreement, the actual terms of the Settlement Agreement shall control.

vi. CMS will rescind the CMS Extrapolated Overpayments (totaling $1,130,283,438.89) prior to application of the Suspended Amounts to the Settlement Amount, and the Debtor relinquishes all rights to appeal or challenge such overpayments.

b. **Lifting of Payment Suspension.** The United States will begin termination of the Payment Suspension on the Effective Date, which will be completed in 120 days. The Debtor will not resubmit or appeal previously denied claims tied to the covered conduct and waives any right to bill patients or third-party payors for the covered claims.

c. **Cooperation and Debtor Obligations.** The Debtor will cooperate with the United States ongoing investigation and take certain actions relating to Unallowable Costs, including identifying and accounting for Unallowable Costs, if any.

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

g. **Release by the United States** [redacted]**.** Upon full payment, the United States [redacted] will release the Debtor from any claim [redacted] they have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

h. **Permanent Exclusion.** The Debtor will be excluded for a period of 50 years pursuant to 42 U.S.C. § 1320a-7(b)(7) from Medicare, Medicaid, and all other federal health care programs upon the Effective Date.

i. **Patient Records.** The Debtor will arrange for patient records to be stored for an additional two years beyond the period previously ordered by the Court. *See* Docket No. 409.

j. **Plan.** The Debtor shall file a motion seeking approval of a disclosure statement and/or Plan (a "Solicitation Package") no later than October 15, 2026. In the Plan, the United States' Allowed Super Priority Claim will be paid ahead of all allowed claims in the Bankruptcy Case, except for the

following: (i) amounts required to be paid to the Clerk of Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a); (ii) all postpetition taxes of any kind required to be paid to any federal, state, or municipal governmental entity by the Debtor; (iii) reasonable unpaid fees and expenses incurred by persons or firms retained by the Debtor during the Bankruptcy Case pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Professional Fees") to the extent such amounts are allowed by final order of the Bankruptcy Court after notice and hearing; and (iv) the salary and expenses owed or owing to Dr. Owen Ellington, not to exceed $27,000 per month, through the earlier of (a) the effective date of a confirmed Plan or (b) December 1, 2026.

i. **$500,000 Available For Creditors.** The Debtor retains up to $500,000 from funds otherwise payable to the United States pursuant to the terms of the Stipulation and this Settlement to pay any valid claims, including any allowed Administrative Expense claims (in addition to the court costs and U.S. Trustee fees, post-petition taxes, allowed Professional Fees, and the salary of Dr. Ellington, which are provided for separately), allowed priority prepetition claims, and allowed general unsecured claims; *provided, however*, that no payment may be made to Wound Pros or any owner, affiliate, employee, or operator thereof if they object to this Settlement or fail to vote in favor of confirmation of the Plan.

## RELIEF REQUESTED

21. By this Motion, the Debtor seeks entry of an order (i) authorizing and approving the Settlement Agreement between the Debtor, the United States, and the Relator, and (ii) granting related relief.

## BASIS FOR RELIEF

### A. The Settlement Agreement Should Be Approved Under Bankruptcy Rule 9019.

22. Section 363(b)(1) authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. The Fifth Circuit recognizes that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or

trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.”)).

23. The Settlement Agreement represents a sound exercise of the Debtor’s business judgment. The dispute with the United States has been the central issue in this Case since the Petition Date, and this settlement resolves it on terms that are favorable to the estate under the circumstances. The Government Claims would expose the Debtor to damages that could reach $1.575 billion. The Settlement Agreement resolves all Government Claims for an allowed claim of $525 million, a reduction of approximately 67%, and payment of approximately $310 million currently in the suspense account, or only approximately 20% of the United States’ alleged claim, because the Debtor negotiated for this amount to be satisfied primarily through application of previously withheld amounts (as well as any amounts left in the estate after payment of certain other administrative expenses and claims in prescribed amounts). Without this resolution, the Debtor would face protracted FCA litigation with the United States and an unliquidated Government Claim that would render any meaningful distribution to unsecured creditors impossible. The Settlement Agreement thus preserves the Debtor’s ability to confirm a liquidating plan of reorganization and make a meaningful distribution to other creditors.

**B. The Settlement Agreement Satisfies Bankruptcy Rule 9019 and Should Be Approved.**

24. Bankruptcy Rule 9019(a) provides, in pertinent part, that “[o]n motion by the [debtor in possession] and after hearing on notice to creditors . . . , the court may approve a compromise or settlement.” Fed. R. Bankr. P. 9019(a). Such a dispute is a core proceeding “because it is governed by Rule 9019, which expressly allows the Trustee to seek approval of [a] compromise[.]” *In re Derosa-Grund*, 567 B.R. 773, 781 (Bankr. S.D. Tex. 2017). Rule 9019

allows bankruptcy courts to approve compromises and settlements so long as they are "fair, equitable and in the best interest of the estate." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)).

25. When considering whether a compromise is "fair, equitable and in the best interest of the estate," the Court must weigh the "terms of the compromise with the likely rewards of litigation." *In re Jackson Brewing Co.*, 624 F.2d at 602 (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)). Additionally, courts should consider the following factors:

(1) The probabilities of ultimate success should the claim or claims be litigated;

(2) The complexity, expense, and likely duration of litigating the claims;

(3) The difficulties of collecting a judgment rendered from such litigation; and

(4) All other factors relevant to a full and fair assessment of the wisdom of the compromise.

*TMT Trailer Ferry*, 390 U.S. at 424; *see also Official Committee of Unsecured Creditors v. Cajun Elec. Power Cooperative, Inc.* (*In re Cajun Elec. Power Cooperative, Inc.*), 119 F.3d 349 (5th Cir. 1997).

26. With respect to the fourth factor, courts have considered: the paramount interests of creditors with proper deference to their views, the amount of creditor support for the compromise settlement, the extent to which the proposed settlement is the product of arm's-length negotiations, whether the proposed settlement is with an insider, and whether the proposed settlement promotes the integrity of the judicial system. *See In re Foster Mortg. Corp.*, 68 F.3d at 917; *In re Kallstrom*, 298 B.R. 753, 761 (B.A.P. 10th Cir. 2003).

27. A court should not substitute its own judgment for the business judgment of the Debtor. *In re J.C. Penney Direct Marketing Services, LLC*, 50 F.4th 532 (5th Cir. 2022) (Fifth Circuit states, in a different context, that, in analyzing a decision under the "Business Judgment Rule," the question is "whether the decision 'appears to enhance a debtor's estate.'"); *Matter of Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984). A court, in reviewing a proposed settlement, is not to decide the numerous questions of law and fact but rather to canvass the issues to determine whether the settlement falls below the lowest point in the range of reasonableness. *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *accord Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

28. The Settlement Agreement is reasonable, fair, equitable, and in the best interests of the Debtor's estate. A review of the factors discussed above supports Court approval of the Settlement Agreement.

*i. Probability of Success in Litigation.*

29. The probability of success factor weighs decisively in favor of settlement. The United States has assembled substantial evidence supporting its claims—evidence the Debtor has reviewed in detail during the course of the FCA Litigation and settlement negotiations concerning the Government Claims. The Debtor has determined that the United States' evidence would be difficult to overcome at trial and presented a material risk of a judgment against the Debtor. Had this matter proceeded to litigation, the Debtor faced exposure of over $1.5 billion. Given the volume of claims at issue and the strength of the United States' evidence, full litigation could result in liability substantially exceeding the Settlement Amount. The legal standards under the FCA—the "deliberate ignorance" and "reckless disregard" scienter standards (31 U.S.C. § 3729(b)(1)(A))—create a risk of a fact-finding ruling for the United States as to intent.

30. Additionally, because these claims arise from the FCA, the United States would likely argue that pursuant to §§ 523(a)(2) and 1141(d)(6), the FCA-based debts, including fines, penalties, and forfeitures, are nondischargeable. Again, while the Debtor believes it has defenses to all these arguments, the litigation would be costly and time-consuming.

*ii. Complexity, Expense, and Duration of Litigation.*

31. The complexity, expense, and duration of the settled litigation weigh heavily in favor of settlement. Medicare-fraud, FCA, and kickback cases against the United States are inherently complex, requiring extensive discovery regarding billing practices, Medicare enrollment procedures, clinician supervision arrangements, and compensation structures. FCA cases can require reviewing hundreds of thousands of corporate emails, medical records, or government invoices. The Debtor would also likely be compelled to pay for expensive data hosting platforms and expert witnesses (such as statisticians or compliance experts). Further, the opponent, the federal government, has immense resources to prosecute any given case (and the United States has placed a focus on wound care providers recently). *See, e.g.*, Robert King, *CMS Finalizes Major Crackdown on Skin Substitutes*, Politico (Oct. 31, 2025), https://subscriber.politicopro.com/article/2025/10/cms-finalizes-major-crackdown-on-skin-substitutes-00632438 (last visited Aug. 29, 2026). The investigation of the Government Claims has already spanned multiple years and involved production of voluminous documents and data under civil investigative demands. Full-scale litigation would require substantial expert testimony on Medicare reimbursement rules, healthcare compliance, and damages calculations. Moreover, FCA cases are frequently protracted, lasting years. The professional fees and litigation costs associated with defending against the United States' fact-intensive claims, spanning over thousands of individual claims and many years, would substantially deplete estate resources. Full

litigation through trial could cost the estate millions in professional fees. Those resources are better preserved for the estate and creditors through settlement.

*iii. Difficulties of Collection.*

32. This factor is not relevant as typically applied because the Debtor does not assert claims against the United States and seek to collect on them. However, to the extent that the Debtor sought to recover amounts in the suspense account that total over $316 million, the Debtor has determined it would have a difficult path to collecting any amount already held by the United States even if it were able to prevail on the FCA issues. The likely "best" path for the Debtor in litigation is to reduce the amount asserted by the United States, and not affirmatively "collect" from the treasury of the United States, therefore this factor has less relevance than in other Rule 9019 situations. *In re Tower Auto. Inc.*, 241 F.R.D. 162, 170 (S.D.N.Y. 2006) (when settlement concerned "monetary reductions [of a claim], collection is not an issue" to be considered under Rule 9019). Regardless, the United States contends that, absent settlement, it would have an allowed claim in the amount of at least $1.575 billion. Collecting any of the more than $300 million currently held in the suspense account would require the Debtor to defeat all the United States' arguments regarding the FCA and then defeat the United States' arguments that any CMS overpayment claims could be recouped from the amounts currently in the suspense account. *See, e.g., Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosps., Inc.)*, 224 F.3d 1008, 1011 (9th Cir. 2000); *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390 (D.C. Cir. 1997); *University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065 (3d Cir. 1992) (all recognizing Medicare right of recoupment to recover prior overpayments although employing different analytical approaches and adopting differing definitions of what constitutes the "same transaction" for the purposes of recouping overpayments). The Settlement Agreement reduces the

amount claimed by the United States without need of litigation. There is not a realistic chance of collecting from the United States any amount that offsets this reduction in United States claim.

*iv. The Interests of Creditors and Other Factors.*

33. The Settlement Agreement is the product of extensive arm's-length negotiations between the Parties and their respective counsel. The Settlement Agreement provides finality and allows the Debtor to move forward with a liquidating plan that provides a meaningful recovery for creditors other than the United States. Absent the Settlement Agreement, the Debtor's access to funds to pay administrative expenses and make a distribution to creditors would be subject to arguments by the United States that its rights under the Stipulation give it rights to all the funds remaining in the Debtor's estate by virtue of the super-priority administrative expense approved in the Stipulation. *See* Stipulation at ¶ 7(b) ("The United States will receive a super priority administrative claim, pursuant to § 507(b), up to the amount of any Released Payments for any of the United States' debts not satisfied through offset."). The Settlement provides unchallenged access for the Debtor to significant funds. The alternative is protracted litigation with the United States (which would likely hold up any Plan process). In its business judgment, the Debtor has determined that this resolution is in the best interest of its estate. For these reasons, the Settlement Agreement is in the paramount interests of creditors and should be approved.

34. Accordingly, the Debtor submits that the Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved.

**NOTICE**

35. The Debtor has provided notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the twenty (20) largest unsecured claims against the Debtor; (c) the Office of the United States

Attorney for the Southern District of Texas; (d) the United States Department of Justice, Civil Division; (e) the Centers for Medicare & Medicaid Services; (f) the United States Department of Health & Human Services; and (g) any party that has appeared electronically in this Case and/or requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the Proposed Order: (i) authorizing and approving the Settlement Agreement between the Debtor, the United States, and the Relator, (ii) granting the relief requested in the Motion, and (iii) granting such other and further relief as is just and proper.

Dated: September 11, 2026
Houston, Texas

*/s/ Casey W. Doherty, Jr.*
Casey W. Doherty, Jr.
**DENTONS US LLP**
1300 Post Oak Boulevard, Suite 650
Houston, Texas 77056
Phone: 713 658 4600
Email: casey.doherty@dentons.com

Samuel R. Maizel (admitted *pro hac vice*)
Tania M. Moyron (admitted *pro hac vice*)
**DENTONS US LLP**
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Phone: 213 623 9300
Email: samuel.maizel@dentons.com
tania.moyron@dentons.com

*Counsel to the Debtor and Debtor in Possession*

**CERTIFICATE OF SERVICE**

This is to certify that on [DATE], I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Casey W. Doherty, Jr*
Casey W. Doherty, Jr.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GLOBAL WOUND CARE MEDICAL GROUP, a Professional Corporation,[1]<br><br>Debtor and Debtor in Possession. | Chapter 11<br><br>Case No. 24-34908 (CML) |

**DECLARATION OF LOUIS E. ROBICHAUX IV IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 (I) AUTHORIZING AND APPROVING THE DEBTOR'S SETTLEMENT AGREEMENT WITH THE UNITED STATES AND RELATOR; AND (II) GRANTING RELATED RELIEF**

1. I am a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura"). I have over 30 years of healthcare industry and restructuring experience, with significant expertise serving in chief restructuring officer roles. I have provided restructuring, crisis management, financial advisory, and expert witness services to parties in a broad variety of distressed corporate settings, with a significant emphasis on the US healthcare industry.

2. In the above-captioned case (the "Case"), I am the Chief Restructuring Officer ("CRO") of Global Wound Care Medical Group, a Professional Corporation, the debtor and debtor in possession (the "Debtor").

3. Except as otherwise indicated herein, this declaration (the "Declaration") is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor or the Debtor's legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and the healthcare

[1] The last four digits of the Debtor's tax identification number in the jurisdiction in which it operated is 3572.

industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. This Declaration is in support of the *Motion for Entry of Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving the Debtor's Settlement Agreement with the United States and Relator* (the "Motion")[2] and for all other purposes permitted by law.

5. On the Petition Date, the Debtor operated a medical practice that provided wound care services, primarily to elderly patients who received Medicare. The Debtor was licensed in more than 20 states and had a team of over 200 wound care providers that treated over 2,000 wounds daily. The Debtor relied overwhelmingly on government healthcare programs for its revenue, with the Medicare and Medicaid programs providing the vast majority of its income for services provided to patients who rely on such programs for their medical expenses.

6. The Debtor was, both pre- and postpetition, by Wound Pros Management Group, Inc. ("Wound Pros"), a management-services organization, pursuant to a Management Services Agreement (the "MSA"). Pursuant to the MSA, Wound Pros handled all of the Debtor's non-clinical, administrative, and business operations, including billing and collections, legal and regulatory compliance, and administrative and infrastructure support.

7. In the FCA Litigation, it is alleged, among other things, that the Debtor and related entities and individuals violated the FCA by submitting or causing the submission of (1) claims asserting that medical treatment had been provided by non-physician personnel "incident to" a physician's services when that was not correct, and (2) paid improper "incentive" payments to independent contractor clinicians for the ordering, application, and billing of biologic skin substitutes in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

8. Based on subsequent investigations, the DOJ also alleges that the Debtor enrolled in the Medicare program fraudulently by not disclosing affiliations with certain other entities and persons.

[2] Unless otherwise defined herein, all capitalized terms shall have the same meaning as in the Motion.

9. In sum, the DOJ alleges the conduct described above violated the FCA, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and related provisions of federal law. The United States, acting through the DOJ and CMS, has asserted claims exceeding $1.5 billion against the Debtor arising under these statutes (collectively, the "Government Claims").

10. On September 11, 2024, CMS, in consultation with the Office of the Inspector General of HHS, acting through Qlarant Integrity Solutions, LLC ("Qlarant"), a CMS Unified Program Integrity Contractor, notified the Debtor that its Medicare payments had been suspended (the "Payment Suspension") based on "credible allegations of fraud."

11. On October 11, 2024, the Debtor submitted a rebuttal letter contesting the Payment Suspension and disputing the allegations of fraud. However, the Payment Suspension represented an existential threat to the Debtor, and without the ability to obtain immediate relief from the Payment Suspension outside of bankruptcy, the Debtor filed this Case on the Petition Date of October 21, 2024.

12. Throughout the Case, the United States and the Debtor have engaged in negotiations concerning the FCA Litigation and the Payment Suspension.

13. I am informed and believe that (a) as of June 20, 2026, the amount of approved paid claims held in suspense by CMS is $316,752,545.74 (the "CMS Suspended Amount"); (b) the CMS Suspended Amount will continue to accrue until the termination of the suspension; (c) beginning on or about May 13, 2025, DHA suspended TRICARE payments to the Debtor pursuant to 32 C.F.R. § 199.9(h); (d) as of June 17, 2026, the amount of approved paid claims held in suspense by DHA is $1,106.08; and (e) the amount held in suspense by DHA will continue to accrue until the termination of the suspension.

14. Throughout 2025, the Debtor continued to operate under the Payment Suspension Stipulation. However, beginning in the late summer of 2025, Medicare Administrative Contractors ("MACs") dramatically increased the number of Additional Documentation Requests ("ADRs") issued to the Debtor. Whereas the Debtor received fewer than 50 ADRs in total between January

and July 2025, by late September and October 2025, the Debtor was receiving as many as 50 ADRs per day. This surge in ADRs significantly impacted the Debtor's Medicare reimbursement timeline and cash flow.

15. By October 2025, the slowdown in Medicare reimbursements created an imminent threat to the Debtor's continued operations. As of October 21, 2025, the Debtor's cash on hand fell dramatically.

16. Then, in October 2025, CMS finalized rules shifting most skin substitute products used by the Debtor to treat its patients (cellular and tissue-based products) away from the old average sales price plus 6% model and announced that, starting in January 2026, these products were re-categorized as "incident-to" supplies at a new flat, standardized rate of roughly $127 per square centimeter. As a result of this change, the Debtor's projected cash flow was reduced by 90%, making continued operations financially impossible, and so, in December 2025, the Debtor suspended operations and terminated the employment of all of its employees other than the Chief Executive Officer and the Chief Restructuring Officer.

17. The United States has assembled substantial evidence supporting its claims. Full litigation could result in liability substantially exceeding the Settlement Amount. The complexity, expense, and duration of the settled litigation weigh heavily in favor of settlement. Medicare-fraud, FCA, and kickback cases against the United States are inherently complex, requiring extensive discovery regarding billing practices, Medicare enrollment procedures, clinician supervision arrangements, and compensation structures. FCA cases can require reviewing hundreds of thousands of documents. The Debtor would also likely be compelled to pay for expensive data hosting platforms and expert witnesses. Full litigation through trial could cost the estate millions in professional fees. Those resources are better preserved for the estate and creditors through settlement.

18. The Settlement Agreement provides finality and allows the Debtor to move forward with a liquidating plan that provides a meaningful recovery for creditors other than the United States. Absent the Settlement Agreement, the Debtor's access to funds to pay administrative

expenses and make a distribution to creditors would be subject to arguments by the United States that its rights under the Stipulation give it rights to all the funds remaining in the Debtor's estate by virtue of the super-priority administrative expense approved in the Stipulation. The Settlement provides unchallenged access for the Debtor to significant funds.

19. In summary, the Settlement Agreement is the product of extensive good-faith negotiations between the Parties and their respective counsel and representatives. Entering into the Settlement Agreement is (i) in the best interests of the Debtor and its estate and (ii) is necessary for the Debtor to confirm the Plan.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: September 11, 2026

*<u>/s/ Louis E. Robichaux IV</u>*
Louis E. Robichaux IV

# **EXHIBIT A**

(Proposed Form of Order)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GLOBAL WOUND CARE MEDICAL GROUP, a Professional Corporation,[3]<br><br>Debtor and Debtor in Possession. | Chapter 11<br><br>Case No. 24-34908 |

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 (I) AUTHORIZING AND APPROVING SETTLEMENT AGREEMENT WITH THE UNITED STATES AND RELATOR; AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[4] of Global Wound Care Medical Group, a Professional Corporation, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), for entry of an order pursuant to § 105 of the Bankruptcy Code and Bankruptcy Rule 9019 (i) authorizing and approving the Debtor's entry into a Settlement Agreement with the United States and the Relator; and (ii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon any hearing held on the Motion; and all objections, if any, to the relief requested in the Motion

[3] The last four digits of the Debtor's tax identification number in the jurisdiction in which it operates are 3572.

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

having been withdrawn, resolved, or overruled; and upon consideration of the Robichaux Declaration; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and all parties in interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. The Debtor is authorized to enter into the Settlement Agreement with the United States and the Relator, and the Settlement Agreement is hereby approved.

2. The Settlement Agreement is the product of extensive, good-faith, arm's-length negotiations between the Debtor and the United States and their respective representatives.

3. The Settlement Agreement is fair, equitable, and in the best interests of the Debtor, its estate, its creditors, and all parties in interest.

4. The Debtor is authorized to enter into, perform, execute, and deliver all documents, and take all actions, necessary to immediately continue and fully implement the Settlement Agreement in accordance with the terms, conditions, and agreements set forth therein, all of which are hereby approved.

5. The Debtor's entry into the Settlement Agreement represents a reasonable exercise of the Debtor's sound business judgment under § 105 of the Bankruptcy Code.

6. The Debtor is authorized to take all actions necessary or appropriate to carry out the relief granted in this Order.

7. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____________, 2026 ________________________________________

Christopher M. Lopez
United States Bankruptcy Judge

# EXHIBIT B

(Settlement Agreement)

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS"); the Defense Health Agency ("DHA"), acting on behalf of the TRICARE Program; and the United States Department of Veterans Affairs ("VA," and together with OIG-HHS, HHS, and DHA, the "United States"); Global Wound Care Medical Group, P.C. ("Global Wound Care" or "Debtor"); [redacted]. The United States, Global Wound Care, and [redacted] are collectively referred to as the "Parties."

RECITALS

A. Global Wound Care is a professional corporation headquartered at 5901 W. Century Boulevard, Suite 750 in Los Angeles, California. Following its incorporation in 2023, Global Wound Care enrolled in the Medicare program and other Federal health care programs. It provided wound care services and supplies to patients, including Medicare beneficiaries, until it ceased operations in December 2025.

B. Global Wound Care was managed, pursuant to a management services agreement, by COMPANY 1, a management-services organization headquartered in Los Angeles, California. COMPANY 1 was co-owned by PERSONS A and B until about May 1, 2024, when PERSON A became its sole owner.

C. [redacted]

[redacted]

D. On October 21, 2024, Global Wound Care filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") under the case captioned *In re Global Wound Care Medical Group*, No. 24-34908 (Bankr. S.D. Tex.) (the "Bankruptcy Case"). On December 19, 2024, Global Wound Care and the United States entered a *Stipulation and Agreed Order Regarding Suspension of Medicare Payments to the Debtor by the United States Department of Health and Human Services* (the "Stipulation") that was approved by the Bankruptcy Court. *In re Global Wound Care Medical Group*, No. 24-34908 (Bankr. S.D. Tex.) at Bankruptcy Case Dkt. 87.

E. In December 2025, Global Wound Care suspended operations and terminated the employment of its employees other than the Chief Executive Officer and the Chief Restructuring Officer. Global Wound Care, subject to the conditions set forth in this Agreement, intends to file a liquidating plan of reorganization in the Bankruptcy Case (a "Plan").

F. The United States contends that Global Wound Care submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"); the TRICARE Program, 10 U.S.C. §§ 1071-1110b ("TRICARE"); and the Department of Veterans Affairs, Veterans Health Administration, 38 U.S.C. Chapter 17.

G. The United States contends that it has certain civil claims against Global Wound Care as described below.

1. Medicare Enrollment Fraud

CMS requires that providers and suppliers seeking to enroll in the Medicare program provide complete, accurate, and truthful information in their enrollment applications so that CMS may evaluate whether the enrollment presents an undue risk of fraud, waste, or abuse. As relevant here, pursuant to Medicare's enrollment regulations, CMS requires applicants to disclose all affiliations with certain individuals or entities that pose an undue risk of fraud, waste, or abuse to the Medicare program. In connection with this requirement, CMS requires applicants to disclose all individuals with a 5% or greater ownership interest in an enrolling entity. CMS also requires providers to disclose any organization that exercises operational or managing control over the provider and any managing relationship with a management services organization under contract to furnish management services for the business. CMS further requires providers to disclose any final adverse legal actions imposed against the provider, its owners, or its managers, including felony convictions within ten years of enrollment. If an enrolled provider experiences a change in ownership or control after enrollment, the provider also must submit a change of information within 30 days.

Given the importance of this information to protecting the Medicare program from potential fraud, waste, and abuse, CMS has the authority to deny or revoke a provider's enrollment if it fails to fully and completely disclose the required information.

a. Medicare Enrollment of COMPANY 2

In 2019, COMPANY 2 sought and—based on materially false statements and omissions in its enrollment form—obtained enrollment in the Medicare program. In particular, COMPANY 2 failed to disclose certain required information, including the ownership interest of

PERSON A, as well as PERSON A's 2013 felony conviction for bank fraud pursuant to 18 U.S.C. § 1344(2). Had COMPANY 2 truthfully disclosed this information on its Medicare enrollment form, CMS would have denied its enrollment. In addition, had CMS learned of COMPANY 2's failure to disclose this information at any time after its enrollment, CMS would have revoked its enrollment. Because COMPANY 2 should not have been enrolled in the Medicare program, it should not have billed Medicare for its services, and the Medicare claims it submitted from 2019 through 2023 were ineligible for payment and therefore false under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

b. Medicare Enrollment of Global Wound Care

On February 24, 2023, CMS notified COMPANY 2 that its Medicare enrollments would be revoked pursuant to 42 C.F.R. § 424.519(i), effective March 2023 due to the revocation of one of its owners, PERSON B. PERSON B's Medicare enrollment was revoked in February 2023 pursuant to the same authority, due to his affiliation with a third-party company that also had been revoked and because that affiliation posed an undue risk of fraud and abuse to the Medicare program.

Upon learning of COMPANY 2's imminent revocation, PERSON A and PERSON B formed Global Wound Care as a continuation of COMPANY 2 and affiliated entities, and they submitted, or caused the submission of, 27 enrollment applications to Medicare, each for a different geographic region. At the same time, PERSON A and PERSON B also activated COMPANY 1, an existing but previously dormant company, to serve as Global Wound Care's management services organization so that PERSON A and PERSON B could continue exercising control over and collecting the profits from Global Wound Care.

PERSON A and PERSON B created Global Wound Care to circumvent the March and April 2023 revocations and continue to bill CMS. In email correspondence, PERSON B stated

that they had created Global Wound Care in response to the revocations and that they intended to enroll Global Wound Care using a series of enrollment applications to make it difficult for CMS to regulate their conduct. Describing Global Wound Care as a d/b/a of COMPANY 2 and affiliated entities, PERSON B further stated that they would control Global Wound Care's conduct and keep the money paid to it, and they did in fact access and withdraw funds directly from Global Wound Care's bank account. PERSON A and PERSON B were more informed about and involved in controlling Global Wound Care's business than Global Wound Care's purported owner ("PERSON C"), who was only alerted that Global Wound Care had been created more than a month after the fact.

Other evidence also demonstrates that PERSON A and PERSON B created Global Wound Care as a continuation of COMPANY 2's business. The ownership and management of Global Wound Care and the revoked COMPANY 2, as well as non-settling Affiliated Entities, overlapped, and there was substantial overlap among their patients, providers, and business offices. Global Wound Care also continued to use COMPANY 2's name and logo on marketing materials, documents sent to beneficiaries, employee documentation, websites, and email communications.

The 27 Medicare enrollment applications for Global Wound Care concealed and failed to disclose various facts to CMS, including that (a) PERSON A and PERSON B would exercise managing control over Global Wound Care, (b) COMPANY 1 would serve as Global Wound Care's management services organization, (c) Global Wound Care was a reorganized version of COMPANY 2, and (d) COMPANY 2's enrollment in Medicare had been revoked. Had Global Wound Care disclosed these facts, CMS would have denied its enrollment. Global Wound Care obtained its enrollment by false pretenses, and all claims that it submitted for products and

services, starting with its March 2023 enrollment in Medicare, were ineligible for payment and therefore false under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

2. Biologic Incentive Fees Paid to Independent Contractor Clinicians

From June 1, 2021, to November 30, 2023, COMPANY 2 and Global Wound Care provided remuneration—$25 to $100 "incentive" payments—to independent contractor clinicians for each biologic skin substitute ("biologic") that the clinicians ordered, applied, and billed to Medicare, TRICARE, and the Veterans Health Administration. COMPANY 2 and Global Wound Care intended these payments as incentives to clinicians to order and apply more biologics, and they only paid the independent contractors the incentive payments after Medicare had paid the corresponding claim.

Global Wound Care paid unlawful remuneration to the independent contractors to induce those clinicians to order and apply biologics in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Consequently, all of Global Wound Care's claims for biologics furnished by those clinicians between March 2023, and November 30, 2023, were "false" in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

3. Improper "Incident To" Billing

From January 1, 2019, to April 17, 2024, COMPANY 2 and Global Wound Care submitted claims to Medicare, TRICARE, and the Veterans Health Administration that falsely represented that a physician or other clinician had rendered certain services to obtain reimbursement, or a higher amount of reimbursement, to which COMPANY 2 and Global Wound Care were not entitled. These services did not qualify as being furnished incident to the professional services of a physician or other type of clinician because the personnel furnishing the services did not operate under the direct supervision of the physician or other clinician identified as the rendering provider on the claim, among other requirements that were not

satisfied. Under Medicare's "incident to" rules, providers enrolled in the Medicare program bill for services and supplies provided by other personnel under certain conditions, including but not limited to that those other personnel operate under the provider's direct supervision to provide supplies or services integral to the provider's diagnosis or treatment of a beneficiary.

Between March 2023, and April 17, 2024, Global Wound Care improperly submitted claims to Medicare, TRICARE, and the Veterans Health Administration falsely representing the rendering provider for supplies and services that were, in reality, provided by (a) licensed vocational nurses and registered nurses, which were not otherwise payable in any amount by Medicare and other Federal health care programs; (b) clinicians who were not enrolled in the Medicare program, including the services of nurse practitioners, physician assistants, and Doctors of Physical Therapy, in violation of applicable payment rules; and (c) clinicians who were not supervised by the rendering provider identified on the corresponding claim and in which that purported rendering provider had no role in the provision of medical care. In a notable number of those cases, the non-physician providers who provided the supplies and services had never met the rendering provider falsely identified on the claim or interacted with the falsely-identified rendering provider regarding the diagnosis or treatment of the beneficiary.

The conduct outlined in Paragraphs G.1 through G.3 is referred to below as the "Covered Conduct."

H. Global Wound Care admits and acknowledges the Covered Conduct occurred.

I. [redacted]

This Agreement is a compromise of a disputed claim. To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of

the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

TERMS AND CONDITIONS

1. Global Wound Care will pay to the United States up to $525,000,000 (the "Settlement Amount"). [redacted]

Payment of the Settlement Amount will come from the following sources:

a. Suspended Amounts:

i. Beginning on or about August 29, 2024, CMS suspended payments to Global Wound Care pursuant to 42 C.F.R. § 405.371(a)(2) based upon a determination by the United States that credible allegations of fraud existed (the "CMS Global Wound Care Suspension"). As of June 20, 2026, the amount of payments held in suspense by CMS is $316,752, 545.74. The amount in the CMS Global Wound Care Suspension will continue to accrue any further payments until the termination of the suspension. As of July 20, 2026, CMS determined $10,123,400.35 in overpayments in the ordinary course (the "CMS Ordinary Course Overpayments"). Interest on the CMS Ordinary Course Overpayments will continue to accrue until the termination of the suspension. Once the suspension is terminated, CMS will first apply the suspended funds to the CMS Ordinary Course Overpayments to satisfy them in full. The remainder of the funds held in suspense will be known as the "Available CMS Suspended Amount."

ii. Beginning on or about May 13, 2025, the Defense Health Agency ("DHA") suspended TRICARE payments to Global Wound Care pursuant to 32 CFR § 199.9(h) (the "TRICARE Suspension," and collectively with the CMS Global Wound Care Suspension, the "Suspensions"). As of June 17, 2026, the amount of payments held in suspense by DHA is $1,106.08 (the "DHA Suspended Amount"). This amount will continue to accrue until the termination of the suspension.

iii. The Available CMS Suspended Amount, the DHA Suspended Amounts, and all additional funds that continue to accrue in the Suspensions through the termination of the Suspensions per this Agreement are collectively referred to herein as the "Suspended Amounts."

iv. On the Effective Date of this Agreement, Global Wound Care will forfeit the Suspended Amounts and the United States will retain the Suspended Amounts, including all Suspended Amounts withheld during the Termination Period (as defined below), and apply those funds to payment of the Settlement Amount. Global Wound Care expressly relinquishes any and all rights of any kind that it, or its affiliates or assigns, may have with respect to those funds, including, but not limited to: any and all claims, any and all rights to payment of those funds, and any and all rights to appeal, whether formally or informally and whether administratively or judicially, the right of the United States, CMS, and/or DHA to retain those funds, and any other rights Global Wound Care may have to challenge the withholding or Suspensions in any respect. Global

Wound Care also expressly relinquishes any and all rights of any kind that it, or its affiliates or assigns, may have with respect to CMS's application of payments held in suspense to satisfy the CMS Ordinary Course Overpayments, including, but not limited to: any and all rights to appeal the CMS Ordinary Course Overpayments, whether formally or informally and whether administratively or judicially.

v. CMS, through its Unified Program Integrity Contractors ("UPICs"), initiated reviews of the claims submitted by Global Wound Care. The UPICs conducted a statistically valid random sample of claims and calculated an extrapolated overpayment. In June and July of 2026, CMS notified Global Wound Care that it determined extrapolated overpayments totaling $1,130,283,438.89 (the "CMS Extrapolated Overpayments"). For the sole purpose of effectuating this Agreement, CMS will rescind the CMS Extrapolated Overpayments prior to the application of the Suspended Amounts to the Settlement Amount. Global Wound Care expressly relinquishes any and all rights of any kind that it, or its affiliates or assigns, may have with respect to the CMS Extrapolated Overpayments, including, but not limited to: any and all rights to appeal, whether formally or informally and whether administratively or judicially, the CMS Extrapolated Overpayments.

b. Credits: Any amounts paid to the United States to resolve FCA claims relating to the Covered Conduct by any other defendant in the Civil Action prior to the confirmation of the Debtor's Plan by the Bankruptcy Court (defined below) will be credited towards the Settlement Amount.

c. Allowed Super Priority Claim: The United States shall have a nondischargeable allowed super-priority administrative claim, pursuant to section 507(b) of the Bankruptcy Code, with priority over all other allowed administrative expense claims filed in the Bankruptcy Case, including without limitation, such claims under sections 503(b) and 507(b) of the Bankruptcy Code, subject to the terms and conditions in Paragraph 18 below, for the full amount of the Settlement Amount, less any payments received pursuant to Paragraphs 1.a and 1.b of this Agreement, that is not subject to subordination, reconsideration, or disallowance (the "Allowed Super Priority Claim"). Any amounts recovered by the United States on account of its Allowed Super Priority Claim will be applied to the Settlement Amount.

d. All payments to the United States made by Global Wound Care pursuant to this Agreement shall be made by electronic funds transfers pursuant to written instructions to be requested by Global Wound Care and provided by the United States Department of Justice, Civil Division.

2. CMS and DHA will begin termination of the CMS Global Wound Care Suspension and TRICARE Suspension on the Effective Date of this Agreement, and termination of the Suspensions shall be completed within one hundred and twenty days of the Effective Date of this Agreement (the "Termination Period").

3. [redacted]

[redacted]

4. [redacted]

5. Subject to the exceptions in Paragraph 7 (concerning reserved claims) below, and Paragraph 18 & 20 (concerning bankruptcy) below, and upon the earlier of (a) confirmation by the Bankruptcy Court of the Debtor's Plan or (b) the United States' receipt of the entire Settlement Amount, the United States releases Global Wound Care from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

6. [redacted]

7. Notwithstanding the releases given in Paragraphs 5, 6, and 8 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b. Any criminal liability;

c. Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory exclusion from Federal health care programs;

d. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e. Any liability based upon obligations created by this Agreement;

f. Any liability of individuals;

g. Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

h. Any liability for failure to deliver goods or services due; and

i. Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

8. [redacted]

[redacted]

9. Global Wound Care waives and shall not assert any defenses Global Wound Care may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

10. Global Wound Care fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Global Wound Care has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

11. [redacted]

12. The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare

Administrative Contractor, fiscal intermediary, carrier), TRICARE, the VA health care programs, or any state payer, related to the Covered Conduct.

13. In compromise and settlement of the rights of OIG-HHS to exclude Global Wound Care pursuant to 42 U.S.C. § 1320a-7(b)(7), based upon the Covered Conduct, Global Wound Care agrees to be excluded for a period of fifty (50) years under this statutory provision from Medicare, Medicaid, and all other Federal health care programs, as defined in 42 U.S.C. § 1320a-7b(f). The 50-year exclusion shall be effective upon the Effective Date of this Agreement. Such exclusion shall have national effect. Federal health care programs shall not pay anyone for items or services, including administrative and management services, furnished, ordered, or prescribed by Global Wound Care in any capacity while Global Wound Care is excluded. This payment prohibition applies to Global Wound Care and all other individuals and entities including, for example, anyone who employs or contracts with Global Wound Care, and any hospital or other provider where Global Wound Care provides services. The exclusion applies regardless of who submits the claim or other request for payment. Violation of the conditions of the exclusion may result in criminal prosecution and the imposition of civil monetary penalties and assessments. Global Wound Care further agrees to hold the Federal health care programs, and all federal beneficiaries and/or sponsors, harmless from any financial responsibility for items or services furnished, ordered, or prescribed to such beneficiaries or sponsors after the effective date of the exclusion. Global Wound Care waives any further notice of the exclusion and agrees not to contest such exclusion either administratively or in any state or federal court.

14. Global Wound Care agrees to the following:

a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social

Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Global Wound Care, their present or former officers, directors, employees, shareholders, and agents in connection with:

i. the matters covered by this Agreement;

ii. the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

iii. Global Wound Care's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

iv. the negotiation and performance of this Agreement; and

v. the payment Global Wound Care makes to the United States pursuant to this Agreement, and [redacted]

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as Unallowable Costs).

b. Future Treatment of Unallowable Costs: Unallowable Costs shall be separately determined and accounted for by Global Wound Care, and Global Wound Care shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Global Wound

Care or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c. Treatment of Unallowable Costs Previously Submitted for Payment: Global Wound Care further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Global Wound Care or any of their subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Global Wound Care agrees that the United States, at a minimum, shall be entitled to recoup from Global Wound Care any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment. Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Global Wound Care or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this paragraph) on Global Wound Care's or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d. Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Global Wound Care's books and records to

determine that no Unallowable Costs have been claimed in accordance with the provisions of this paragraph.

15. Global Wound Care agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, Global Wound Care shall encourage, and agree not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. Global Wound Care and the United States agree that, prior to confirmation by the Bankruptcy Court of the Debtor's Plan:

a. Global Wound Care will identify and furnish to the United States, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf;

b. Global Wound Care will arrange for the term of its document-storage contract with Iron Mountain, referenced in its Motion for Entry of Order Authorizing Debtor To: (1) Dispose of Patient Records In Accordance With 11 U.S.C. § 351; And (2) Obtain Related Relief, to be extended for two additional years;

c. Global Wound Care will execute and provide to the United States an affidavit, in a form and substance acceptable to the United States, attesting that the documents and information that Global Wound Care produced to the United States during the course of its investigation are Records of a Regularly Conducted Activity and authentic pursuant to Federal Rules of Evidence 803(6) and 902(11), respectively;

d. Global Wound Care will execute and provide to the United States the completed, signed, and notarized Form Certificates of Compliance for document requests in the Civil Investigative Demand served on Global Wound Care by the United States; and

e. Dr. Owen Ellington will appear for a deposition at a time and location to be mutually agreed upon by Global Wound Care, Dr. Ellington, and the United States.

16. This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 17 (waiver for beneficiaries paragraph) below.

17. Global Wound Care agrees that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

18. In exchange for valuable consideration provided in this Agreement, the Parties agree and acknowledge the following:

a. Global Wound Care shall file a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure (an "Approval Motion") to approve this Agreement, prior to filing a Plan in the Bankruptcy Case, and no later than September 1, 2026. All documents related to, or filed in, the Bankruptcy Case with respect to Global Wound Care and any other party shall be consistent in all material respects with this Agreement and shall not, by their terms, contain any provisions that amend, modify, supplement, supersede or conflict with, any of the provisions of this Agreement in any manner that is materially adverse to, or materially prejudicial to the United States [redacted], in each case, with respect to their rights under this

Agreement. All documents related to the Plan, including, but not limited to the Plan and any order confirming the Plan, shall be in form and substance reasonably acceptable to the United States with respect to the subject matter of this Agreement. In addition, Global Wound Care shall take such actions as may be reasonably necessary or appropriate in the Bankruptcy Case to ensure Global Wound Care will be able to comply with its obligations under this Agreement.

b. Global Wound shall file a motion seeking approval of a disclosure statement and/or Plan (a "Solicitation Package") no later than October 15, 2026.

c. The United States' Allowed Super Priority Claim will be paid ahead of all allowed claims in the Bankruptcy Case, except for the following:

i amounts required to be paid to the Clerk of Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a);

ii all post-petition taxes of any kind required to be paid to any federal, state or municipal governmental entity by Global Wound Care;

iii reasonable unpaid fees and expenses incurred by persons or firms retained by Global Wound Care during the Bankruptcy Case pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Professional Fees") to the extent such amounts are allowed by final order of the Bankruptcy Court after notice and hearing;

iv the salary and expenses owed or owing to Dr. Owen Ellington, not to exceed $27,000 per month, through the earlier of (i) the effective date of a confirmed Plan or (ii) December 1, 2026, whichever date occurs first.

d. The United States has the option to rescind this Agreement in all respects in the event of any of the following:

i. the Bankruptcy Court does not grant the Approval Motion;

ii. the Bankruptcy Case is converted or dismissed;

iii. Global Wound Care fails to file a Solicitation Package by October 15, 2026;

iv. issuance by the Bankruptcy Court or any other court of competent jurisdiction of any ruling, judgment or order enjoining the consummation of this Agreement; or

v. any court of competent jurisdiction has entered a final judgment or order declaring this Agreement to be unenforceable.

e. Global Wound Care acknowledges that, to the extent this Agreement is rescinded for any reason, any civil and/or administrative action, proceeding, or enforcement of a judgment, other than a money judgment, brought by the United States under Paragraph 18 is excepted from the "automatic stay" pursuant to 11 U.S.C. § 362(b)(4) as an exercise of the United States' police and regulatory powers. Global Wound Care waives and shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claim, action, or proceeding brought by the United States within 120 days of written notification to Global Wound Care that the releases have been rescinded pursuant to this paragraph, except to the extent such defenses were available on the Effective Date of this Agreement.

f. The terms of this Agreement shall be binding on any Chapter 7 trustee upon any conversion of the Bankruptcy Cases to Chapter 7.

19. Nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of the United States to protect and preserve its rights, remedies and interests, including any other claims against Global Wound Care not included in the Covered Conduct, its

rights of setoff and recoupment, or its full participation in the Bankruptcy Case. Furthermore, nothing in this Agreement shall be construed to prohibit the United States from appearing as a creditor or a party-in-interest in any matter to be adjudicated in the Bankruptcy Case so long as any appearance by the United States and the positions advocated by the United States in connection therewith are consistent with this Agreement. The United States reserves the right to object to any fee application or proposed Plan for any reason not covered by this Agreement or to the extent that such Plan or any order confirming such Plan is inconsistent with the terms of this Agreement. The United States also reserves its right to seek conversion or dismissal of the Bankruptcy Case if Global Wound Care fails to comply with any of terms herein.

20. The estate may retain $500,000 to pay any valid claims, including any allowed Administrative Expense claims (in addition to the court costs and U.S. Trustee fees, post-petition taxes, allowed Professional Fees, and the salary of Dr. Ellington, which are provided for separately in paragraph 18.c herein), allowed priority prepetition claims, and allowed general unsecured claims from funds otherwise payable to the United States pursuant to the terms of the Stipulation and this Settlement, provided, however, that no payment may be made to Wound Pros Management Group or any owner, affiliate, employee or operator thereof if they object to this Settlement or fail to vote in favor of confirmation of the Plan.

21. Except as provided in Paragraph 4, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

22. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

23. Global Wound Care hereby expressly waive all rights it may have by virtue of Section 1542 of the California Civil Code, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

24. This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the Eastern District of California, provided, however, that the Bankruptcy Court shall have venue to hear disputes related to the Approval Motion, any order approving the Approval Motion, and the Plan and Confirmation Order.

25. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

26. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties. Forbearance by the United States [redacted] from pursuing any remedy or relief available to it under this Agreement shall not constitute a waiver of rights under this Agreement.

27. Each of the undersigned counsel represents and warrants that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

28. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

29. This Agreement is binding on Global Wound Care's successors, transferees, heirs, and assigns.

30. [redacted]

31. All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

32. This Agreement is effective on the later of the following dates: (i) the date that the Bankruptcy Court enters an order granting the approval motion, and (ii) the date of signature of the last signatory to the Agreement (the "Effective Date of this Agreement"). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

33. Any notice required or permitted to be given under this Agreement shall be in writing, shall specifically refer to this Agreement, and shall be addressed to the appropriate Party at the address specified below or such other address as may be specified by such Party in writing in accordance with this paragraph, and shall be deemed to have been given for all purposes (a) when received, if hand-delivered with proof of receipt or sent by a reputable international courier service, or (b) five Business Days after mailing, if mailed by first class certified or registered airmail, postage prepaid, return receipt requested.

34. Any notices or other communications which may be required hereunder are to be sent to the Parties at the following addresses or such other addresses as may subsequently be given to the other party in writing: (a) Global Wound Care, c/o Louis E. Robichaux, Chief Restructuring Officer, Ankura Consulting Group LLC, 1600 Dallas Parkway, Suite 100, Dallas Texas 75248 and Dentons US LLP, Attn: Samuel Maizel, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA, 90017; and (b) the United States: United States Department of Justice, Attn: Kristen Echemendia, Assistant Director, Civil Division, Fraud Section, 175 N Street, NE, Rm. 9.1811, Washington, D.C. 20002 and the United States Attorney for the Eastern District of California, Attn: David Thiess, Deputy Chief, Civil Division, United States Attorney's Office, Robert T. Matsui United States Courthouse 501 I Street, Suite 10-100, Sacramento, CA 95814.

**THE UNITED STATES OF AMERICA**

DATED: 9/10/26 BY: ______________________
Michael R. Fishman
Kristen M. Echemendia
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: 9/10/26 BY: ______________________
David Thiess
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of California

DATED: __________ BY: ______________________
Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

DATED: __________ BY: ______________________
Salvatore M. Maida
General Counsel
Defense Health Agency
United States Department of War

**THE UNITED STATES OF AMERICA**

DATED: __________ BY: ______________________________
Michael R. Fishman
Kristen M. Echemendia
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: __________ BY: ______________________________
David Thiess
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of California

DATED: 9/10/2026 BY: ______________________________
Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

DATED: __________ BY: ______________________________
Salvatore M. Maida
General Counsel
Defense Health Agency
United States Department of War

**THE UNITED STATES OF AMERICA**

DATED: __________ BY: ______________________________

Michael R. Fishman
Kristen M. Echemendia
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: __________ BY: ______________________________

David Thiess
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of California

DATED: __________ BY: ______________________________

Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

DATED: 9/9/2026 BY: BORKENHAGEN.WESTON.EARL.1138755149 Digitally signed by BORKENHAGEN.WESTON.EARL.1138755149 Date: 2026.09.09 11:23:15 -04'00'

**For** Salvatore M. Maida
General Counsel
Defense Health Agency
United States Department of War

---

**GLOBAL WOUND CARE – DEFENDANT**

DATED: 9-9-26 BY: ______________________

Dr. Owen Ellington
Chief Executive Officer
Global Wound Care

DATED: 09/09/26 BY: ______________________

Samuel Maizel
DENTONS US LLP
Counsel for Global Wound Care

[redacted]

# EXHIBIT C

(Payment Suspension Stipulation)

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 19, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL WOUND CARE MEDICAL GROUP,[1] | Case No. 24-34908-CML |
| Debtor. | |

**STIPULATION AND AGREED ORDER REGARDING
SUSPENSION OF MEDICARE PAYMENTS TO THE DEBTOR BY THE
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Global Wound Care Medical Group, a Professional Corporation (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and the Civil Division of the United States Department of Justice ("DOJ"), on behalf of the United States of America, the United States Department of Health and Human Services ("HHS") and its designated component, the Centers for Medicare and Medicaid Services ("CMS,", and collectively with HHS, the "United States," and the United States collectively with the Debtor, the "Parties" and each individually, a "Party") hereby stipulate as follows:

**RECITALS**

**The Parties**

A. The Debtor, a professional corporation incorporated in California, is a medical practice that provides wound care services, primarily to elderly patients that receive Medicare.

[1] The last four digits of the Debtor's tax identification number in the jurisdiction in which it operates is 3572. The service address for the Debtor is 5901 W. Century Blvd., Suite 750, Los Angeles, CA, 90045.

B. CMS, a component agency of HHS, administers the Medicare program under provisions in Title 42 of the United States Code, 42 U.S.C. § 1395 *et seq.,* and regulations promulgated in Chapter IV of Title 42 of the Code of Federal Regulations, (the "Medicare Program"). The Medicare Program is a federally funded health insurance program primarily designed to cover medical care for the elderly and disabled.

**The FCA Investigation**

C. On September 29, 2023, the DOJ served Civil Investigative Demands (the "CIDs") to the Debtor and numerous other individuals and entities operating under the trade name "Wound Pros" in furtherance of an investigation of allegations arising under the False Claims Act, 31 U.S.C. §§ 3729 - 3733; the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and related provisions of Federal law (the "FCA Investigation").

D. On June 27, 2024, the DOJ filed a Petition for Order to Show Cause and Summary Enforcement of Civil Investigative Demands in the United States District Court for the Eastern District of California. *See United States v. Wound Pros Management Group, Inc., et al.*, No. 2:24-MC-00263 (E.D. Ca.). Production under the CIDs remains ongoing.

**The Payment Suspension**

E. On September 11, 2024, CMS, in consultation with the Office of the Inspector General of HHS, acting through Qlarant Integrity Solutions, LLC, a CMS Unified Program Integrity Contractor, notified the Debtor that its Medicare payments had been suspended (the "Payment Suspension") based on "credible allegations of fraud."

F. On October 11, 2024, the Debtor submitted a rebuttal letter contesting the Payment Suspension and disputing the allegations of fraud (the "Rebuttal Letter").

G. As of December 11, 2024, CMS has suspended approximately $208 million for claims submitted by the Debtor to CMS for payment (the "Suspended Amounts").

**The Chapter 11 Case and the Basis of this Agreement**

H. On October 21, 2024 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") seeking relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to section 1184 of the Bankruptcy Code.

I. As of December 12, 2024, the Debtor has approximately (i) $14.3 million in outstanding claims for products and services allegedly provided to Medicare beneficiaries before the Petition Date but not yet submitted to CMS for payment; and (ii) approximately $18.2 million in outstanding claims for products and services allegedly provided to Medicare beneficiaries after the Petition Date but not yet submitted to CMS for payment.

J. After the Petition Date, the United States and the Debtor have engaged in negotiations concerning the FCA Investigation and the Payment Suspension. To facilitate continued negotiations regarding the FCA Investigation, and in exchange for certain protections, CMS will partially and temporarily modify the Payment Suspension subject to the terms and conditions of this Stipulation (the "Stipulation").

**TERMS AND CONDITIONS**

1. **Effective Date**. This Stipulation shall become effective upon entry of an order of the Court approving the Stipulation (the "Effective Date").

2. **Modification of the Payment Suspension**. On the Effective Date, and through the Termination Date (as defined below), and subject to the terms and conditions set forth in this Stipulation, CMS will modify the Payment Suspension to suspend 25% of amounts payable on claims submitted by the Debtor subject to paragraph 4, on or after the Effective Date (the "Continuing Suspended Payments") and allow payment of 75% of amounts payable on claims submitted by the Debtor subject to paragraph 4 on or after the Effective Date (the "Released Payments"). The modification of the Payment Suspension described in this paragraph shall not apply to the Suspended Amounts or any other payments suspended by CMS prior to the Effective Date (collectively, the "Previously Suspended Payments").

3. **Implementation of Modification to Payment Suspension.** On or immediately after the Effective Date, CMS will make reasonable and good faith efforts to implement the modifications to the Payment Suspension, *provided that* in no event shall the failure of any Medicare Administrative Contractor ("MAC"), despite reasonable and good faith efforts to fully implement the suspension modifications within forty-five (45) of the Effective Date (collectively, the "MAC Deadlines"), be considered a breach of this Stipulation. To the extent that any payments are suspended during implementation of the modification of the Payment Suspension and before the MAC Deadlines, they will become Previously Suspended Payments.

4. **Medicare Claims Review.** All claims submitted by the Debtor are subject to the Medicare Program's review procedures (including, but not limited to, pre-payment and post-payment review and audit), and may be paid or denied in the ordinary course of business, with the Parties reserving all rights to contest or defend the treatment of particular claims. Nothing in this Stipulation shall constitute a representation or admission by the United States that any of the Debtor's claims comply with any legal requirements.

5. **Debtor Agreements**. The Debtor agrees to the following:

a. Prior to the Effective Date, the Debtor will seek, on an emergency basis, Court approval for the appointment of a Chief Restructuring Officer (the "CRO") to exercise executive authority over the Debtor's operations. The Debtor will consult with the United States prior to filing its motion for approval and the United States shall have, at its reasonable discretion, the right to veto the Debtor's proposed CRO. The CRO shall remain in such position until the earlier of dismissal or conversion of the case, the date of any final order confirming a Chapter 11 plan of reorganization, *provided that* the United States reserves the right to file a motion at any time seeking removal or dismissal of the CRO. During the term of this Stipulation, all expenditures of funds by the Debtor and withdrawals from the Medicare Receivables Account (as defined below) shall require personal authorization by the CRO.

b. No later than December 31, 2024, the Debtor will submit all claims for services allegedly provided before the Effective Date ("Pre-Effective Date Claims"). If the Debtor submits Pre-Effective Date Claims after December 31, 2024, the Debtor shall repay all amounts released by CMS in payment of such claims, and if such payments are received during the term of the Stipulation, the United States may remove any such payments from the Medicare Receivables Account (as defined below). Between the Effective Date and the Termination Date, any failure to repay Pre-Effective Date Claims within 7 days of such claims being paid shall constitute a breach of the Stipulation.

c. The Debtor shall not seek in any Suspension Challenge (as defined below) to compel the release of the Previously Suspended Amounts pending final resolution or any adjudication of the claims arising from the FCA Investigation. The United States shall be entitled to set off the Previously Suspended Amount against any claims of the United States, or any federal agencies or instrumentalities thereof, against the Debtor upon entry of an order, and the Debtor shall not challenge the timeliness or right to setoff prepetition amounts against prepetition claims, post-petition amounts against post-petition claims, or the debts described in paragraph 7(a); *provided*, *however*, that the Debtor reserves the right to challenge the validity of any such claim.

d. To the extent applicable, the deadline in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure to file a complaint to determine the dischargeability of a debt pursuant to section 523(c) of the Bankruptcy Code is extended for the United States through and including April 30, 2025.

e. The Debtor shall make no attempt to estimate the United States' claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the deadline for the United States to file proofs of claim.

f. The FCA Investigation and any commencement of FCA litigation by the United States is an exercise of the United States' police and regulatory powers, and the Debtor shall not request the Court enjoin the United States' exercise of its police and regulatory powers with respect to the FCA Investigation and litigation pursuant to section 105 of the Bankruptcy Code.

g. This Stipulation, any action taken pursuant to this Stipulation, the termination of this Stipulation, or any action taken to restore the parties to their pre-Stipulation positions, including, but not limited to, the act of reinstating a 100% payment suspension or the revocation or exclusion of the Debtor from Medicare, is in furtherance, and an exercise, of the United States' police and regulatory powers and not an act of discrimination prohibited by section 525(a) of the Bankruptcy Code.

6. **Debtor's Cooperation and Reporting Obligations**. The Debtor shall negotiate and cooperate in good faith with the United States concerning the Payment Suspension and resolution of the FCA Investigation during the term of this Stipulation (the "Debtor's Cooperation Obligations"), including without limitation, by and through the following:

a. The Debtor shall negotiate with the United States in good faith with the aim of reaching an agreement in principle to resolve claims of the United States arising from the FCA Investigation by December 31, 2024. Among other things, the United States' alleged misconduct by the Debtor and other affiliated entities includes submitting or causing the submission of claims for reimbursement to the federal healthcare programs: (i) by allegedly falsely billing for services provided by non-physician personnel "incident to" a physician's services and/or when such non-physician personnel were not enrolled or professionally qualified; (ii) in connection with the alleged payment of unlawful incentives to order biologic skin substitutes; and (iii) in connection with the alleged fraudulent enrollment of the Debtor and other affiliated entities in the Medicare program.

b. The Debtor shall adhere to a weekly Operating Budget, attached hereto as Exhibit "A," for all expenditures, as set forth therein. The weekly Operating Budget shall include, among other things, expenditure categories for compensation and related employment tax

payments to employees; *provided that,* payment of any compensation or related employment tax payments to any of the individuals identified in Exhibit "B" to this Stipulation (the "Related Individuals") shall not exceed the amounts set forth in the Operating Budget.

c. Except with the prior written consent of the United States, the Debtor shall make no expenditures from Released Payments or any non-Medicare revenues in excess of the amounts authorized in the Operating Budget, *provided that*, the Debtor may without prior United States consent, exceed the budgeted amount for expenditures in any category listed in the Operating Budget by an amount not greater than 10% of the budgeted amount for such category, and 10% of total expenditures over a rolling four week cumulative period.

d. The Debtor shall place all Released Payments hereunder into a separate account for Medicare receivables (the "Medicare Receivables Account"), and shall be permitted to use amounts from the Medicare Receivables Account necessary to fund payments permitted in the Operating Budget in the ordinary course of business, together with the permitted variances described in subparagraph (c) above. Absent prior written consent of the United States, the Debtor shall not transfer any funds in excess of budgeted amounts from the Medicare Receivables Account, and the United States shall, pursuant to section 364(c)(2) of the Bankruptcy Code, hold a valid, binding, enforceable, fully-perfected first priority senior security interest in, and lien upon, all of the Debtor's right, title, and interest in, to, and under the Medicare Receivables Account. The United States shall have the right to dispose of the funds in the Medicare Receivables Account in the event of a termination as set forth in paragraph 11 of this Stipulation. Any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise,

is hereby modified, without further notice or order from this Court, to the extent necessary to permit the United States to take any steps necessary to perfect its security interest and rights in, and to, the Medicare Receivables Account, and the Debtor shall take all reasonable and necessary actions to facilitate the United States' perfection of its security interest and right to access the account.

e. Within four business days of the conclusion of each operating week set forth in the Operating Budget, the Debtor shall provide the United States with a weekly cash flow statement showing its expenditures for the operating week, and shall report the amount of any funds remaining on hand at the conclusion of the operating week, if any (the "Weekly Report").

f. The Debtor, without the prior written consent of the United States, shall make no payments, regardless whether permitted in the Operating Budget, (i) on account of any ownership or equity interest of any individual or entity in the Debtor or Wound Pros Management Group, Inc. ("Wound Pros MG"), (ii) to or for the benefit of the Related Individuals other than salaries and related employment taxes permitted in subparagraph (b) above and in the Operating Budget, or (iii) to any entity in which any of the Related Individuals have an ownership or other financial interest or role as an officer or manager ("Related Entities"), aside from approved payments listed in the Operating Budget to Wound Pros MG. In addition, the Debtor shall instruct and ensure that no payments from Wound Pros MG shall be made to any of the Related Individuals or Related Entities. In addition to the United States' termination rights below, upon receiving any information that Wound Pros MG has made any payments to the Related Individuals or Related Entities in violation of this Stipulation, the Debtor shall report to the DOJ the amount and

recipient of such payment and will use its best efforts to recover such improper payment for the benefit of the United States. The Debtor specifically represents and warrants that none of the interests described in this paragraph, nor any other rebate or remuneration to the Debtor, WPMG, or any affiliated individual or entity, exists with regard to its suppliers of biologic materials, including 180 Health Services, Biowounds, and Accesso.

g. The Debtor will provide and will instruct Wound Pros MG to provide the United States with access to any of their books and records necessary and appropriate, in the United States' reasonable discretion, to permit the United States to verify compliance with the terms of this Stipulation. Among any other reasonable access to books and records, the Debtor shall, upon demand, provide copies, of the Debtor's and Wound Pros MG's invoices associated with expenditures, payroll information including copies of pay advices or other documentation evidencing payments to employees, leases and documents evidencing lease payments to any landlords, banking information including statements from all financial accounts, and such other records as the United States may request.

7. **Adequate Protection of the United States' Interests**. As adequate protection of the United States' interests in any Released Payments under this Stipulation, the Parties agree as follows:

a. **Setoff Rights**. Notwithstanding the mutuality requirements of section 553 of the Bankruptcy Code, to the extent the United States' setoff rights, if any, in the Released Payments have been or will be reduced by the release of such payments to the Debtor under this Stipulation, the United States shall have setoff rights against the Previously Suspended Payments, Continuing Suspended Payments, any Medicare Receivables Account, and any pre- or post-petition debts that the United States may owe to the Debtor to the same extent that it had prior to the Petition Date,

including amounts CMS may owe to the Debtor for post-petition services in accordance with the Medicare Program.

b. **Super Priority Administrative Claim**. The United States will receive a super priority administrative claim, pursuant to section 507(b) of the Bankruptcy Code, up to the amount of any Released Payments for any of the United States' debts not satisfied through offset (the "Adequate Protection Claim"). The Adequate Protection Claim shall have priority over all other administrative expense claims, including without limitation, such claims under sections 503(b) and 507(b) of the Bankruptcy Code, except for the following (the "Carve Out"):

(1) amounts required to be paid to the Clerk of the Court and to the Office of the United States Trustee (the "U.S. Trustee"), pursuant to 28 U.S.C. § 1930(a); (2) all post-petition taxes of any kind required to be paid to any federal, state or municipal governmental entity by the Debtor; (3) reasonable unpaid fees and expenses incurred by persons or firms retained by the Debtor pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor's Professionals"), to the extent such amounts are (A) (y) incurred or accrued prior to the Termination Date and remain unpaid, and (z) allowed by final order of the Court, plus (B) an amount of no more than $500,000 (five hundred thousand dollars) after termination of this Stipulation to the extent allowed by final order of the Court; (4) reasonable unpaid fees and expenses of the CRO to the extent such amounts are allowed by the Court; and (v) salaries and expenses owed or owing to the Debtor's employees and independent contractors in the amounts described in the weekly Operating

Budget. The United States reserves all rights to object to the approval of any payments of the amounts described in items (3)-(5) in the preceding sentence.

8. **Debtor's Breach**. Any of the following shall constitute a breach of this Stipulation by the Debtor (a "Debtor's Breach"): (a) the Debtor's violation of any of the Debtor's Cooperation Obligations, including without limitation, the payment restrictions and limits on expenditures set forth therein and in the Operating Budget; (b) a determination by the DOJ, in its reasonable discretion, that the Debtor has failed to cooperate with any investigation or audit by the United States; (c) the Debtor's violation of any other material term of this Stipulation; (d) the filing, during the term of the Stipulation, of an adversary proceeding, motion or other action by the Debtor asserting that the Payment Suspension violates sections 362 or 542 of the Bankruptcy Code, asserting a violation of section 525 of the Bankruptcy Code, or seeking injunctive relief requiring release of the Payment Suspension (a "Suspension Challenge"); (e) the Debtor's closure or cessation of its business operations; (f) the Debtor's voluntary disenrollment or voluntary termination as a Medicare provider or supplier under applicable Medicare law and regulations; (g) a determination by the DOJ or any federal law enforcement or investigative agency that any postpetition criminal act or fraudulent act not already part of the FCA Investigation as described in Paragraph 6(a) has been committed by the Debtor and requires termination of the Stipulation; or (h) a determination by the DOJ or any federal law enforcement or investigative agency that the Debtor has made material misrepresentations in this Stipulation, including, but not limited to, the amounts described in paragraph I or the representations in paragraph 6(f).

9. **Termination for Breach.** The United States may terminate this Stipulation upon any Debtor's Breach or if the DOJ determines, in its sole discretion, that negotiations regarding the FCA Investigation will not result in a successful resolution of the United States' claims (a "Settlement

Impasse"). If the DOJ terminates this Stipulation based on a Settlement Impasse, or based on any of the breaches described in paragraph 8(a) through (c) or (h), the DOJ shall provide (3) business days written notice to the Debtor, its counsel, the CRO, and the United States Trustee, and an opportunity to cure such breach prior to such termination (the "Termination Date"), *provided that* the termination shall take effect on the Termination Date and shall remain in effect unless the Court orders otherwise. If Debtor breaches this Stipulation in accordance with paragraph 8(d) through (g) (each such breach, an "Automatic Termination Event"), the DOJ need not provide notice to the Debtor prior to termination or a right to cure such breach.

10. **Termination Other Than for Breach.** Unless terminated for a Debtor's Breach, the Stipulation shall automatically terminate on the earliest of: (a) December 31, 2024, unless the DOJ agrees in its sole discretion to extend the term of the Stipulation past such date; (b) the appointment of a Chapter 11 trustee pursuant to section 1104 of the Bankruptcy Code; (c) the conversion or dismissal of the Chapter 11 Case, or the filing of any Debtor's motion seeking such conversion or dismissal; or (d) an involuntary termination, revocation, or exclusion of the Debtor as a Medicare provider or supplier under applicable Medicare law and regulations.

11. **Termination and Medicare Receivables Account.** Upon the earlier of the issuance by the United States of a notice of termination or any Automatic Termination Event, the Debtor's authorization to use funds in the Medicare Receivables Account shall terminate immediately, and any stay, whether arising under section 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice or order from this Court, to the extent necessary, to permit the United States to exercise its rights and remedies with respect to the Medicare Receivables Account, including disposing of any funds held in the Medicare Receivables Account except for already incurred expenses that would be subject the Carve Out. The Debtor will follow any disposition

instructions from the DOJ regarding funds held in the Medicare Receivables Account and will cooperate in the DOJ's efforts to dispose of such funds.

12. **Debtor's Post-Termination Suspension Challenge**. If this Stipulation is terminated based on any Debtor's Breach, the Debtor shall waive any and all rights to bring a Suspension Challenge, and, in accordance with the terms of this Stipulation, shall make no assertion in any court or administrative forum that the Payment Suspension constitutes a violation of the automatic stay or an act of bankruptcy discrimination pursuant to section 525 of the Bankruptcy Code. If the Stipulation is terminated for any reason other than a Debtor's Breach, the Debtor reserves the right on or after the Termination Date, to file a Suspension Challenge, *provided that* the Debtor shall not seek recovery of any of the Previously Suspended Amounts or Continuing Suspended Payments, and *provided further that* the United States reserves all rights to contest the Suspension Challenge, including arguments concerning the Court's subject matter jurisdiction over any issues raised in the Suspension Challenge.

13. **Debtor's Indemnification Obligations**. The Debtor and any reorganized Debtor that emerges from this Chapter 11 Case (the "Reorganized Debtor") shall indemnify and hold the United States harmless from any losses, claims, damages, liabilities, and expenses asserted against the United States arising out of the Debtor's performance of its obligations under this Stipulation ("Indemnification Obligations"). To the extent the Debtor fails to pay its Indemnification Obligations, the United States shall have a super priority administrative expense claim against the estate for any of the Indemnification Obligations and may seek reimbursement from the Reorganized Debtor for any Indemnification Obligations not satisfied by the Debtor's estate.

14. The United States' entry into this Stipulation shall not constitute or effectuate a waiver of sovereign immunity or a consent to the Court's jurisdiction or authority to adjudicate

any matter, including without limitation, the Payment Suspension and any claims arising from the FCA Investigation.

15. The United States' entry into this Stipulation does not prejudice, limit or otherwise enjoin the United States from asserting that the Debtor's case was not filed in good faith and/or should be dismissed pursuant to section 1112 of the Bankruptcy Code.

16. Neither the United States' entry into the Stipulation, nor any term of the Stipulation, shall constitute (i) an admission concerning any legal or factual element of any claims arising from any investigation or audit by the United States, including without limitation the FCA Investigation (including, but not limited to, any materiality element under the False Claims Act); or an alteration discharge or release of any claims arising from any investigation or audit by the United States, including without limitation the FCA Investigation. The Debtor shall make no representation to the contrary in any document filed with, or argument or proceeding in, any court or other judicial or administrative tribunal.

17. Nothing in this Stipulation alters, discharges or releases any debts owed by the Debtor to the United States or any federal agencies or instrumentalities thereof.

18. Nothing contained herein shall (a) restrain, limit or impact any action by HHS or CMS to administer, regulate and enforce the Medicare Program; or (b) affect, modify or impair any claims, defenses, recoupment or setoff rights, of the United States, except as expressly provided herein. This Stipulation shall not affect, modify or impair the rights of the Debtor with respect to such claims, defenses, recoupment or setoff rights.

19. The provisions of this Stipulation, other than the Debtor's Cooperation Obligations set forth in paragraph 6, shall survive termination of this Stipulation and shall be enforceable

against the Debtor or any of the Debtor's successors or assigns, or any trustee or examiner appointed in the Debtor's bankruptcy case.

20. Each Party hereto agrees that it has fully participated in the drafting of this Stipulation. The rule of law which provides that ambiguities will be construed against the drafting party in interpreting written instruments shall not be applicable to or used in resolving any dispute over the meaning or intent of this Stipulation or any of its provisions.

21. Headings used to identify this Stipulation's provisions, including the articles, sections, clauses, as well as any exhibits and schedules, do not have any substantive meaning or interpretive value.

22. This is the full and complete agreement of the Parties, and each Party has entered into this Stipulation voluntarily and without duress.

23. Any disputes regarding the rights arising hereunder shall be governed by federal law.

24. This Stipulation is subject to the approval of the Court and is of no force and effect until so approved.

**SO ORDERED AND APPROVED:**

Signed: December 19, 2024

Christopher Lopez
United States Bankruptcy Judge

Dated: December 17, 2024

Respectfully submitted,

/s/ Casey Doherty
Casey Doherty
Dentons US LLP
1300 Post Oak Boulevard, Suite 650
Houston, Texas 77056
Phone: (713) 658-4600
Email: casey.doherty@dentons.com

Samuel R. Maizel (admitted *pro hac vice*)
Tania M. Moyron (admitted *pro hac vice*)
Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017
Phone: (213) 623-9300
Email: samuel.maizel@dentons.com
tania.moyron@dentons.com

*Counsel for the Debtor*

BRYAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ (12/19/24)
KIRK T. MANHARDT
MARY A. SCHMERGEL
AUGUSTUS T. CURTIS
ANDREW WARNER
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 875
Ben Franklin Station
Washington D.C. 20044
Tel. (202) 598-7524
Email: augustus.t.curtis@usdoj.gov

*Counsel for the United States*

**CERTIFICATE OF SERVICE**

This is to certify that I have on December 19, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Casey W. Doherty*
Casey W. Doherty

**Exhibit A**

(Operating Budget)

**Global Wound Care Medical Group and Wound Pros Management Group**
**December Operating Budget**
**Period Ended December 31, 2024**

| | Week Ended 12/21/2024 | Week Ended 12/28/2024 | 3-Days Ended 12/31/2024 | TOTAL |
|---|---|---|---|---|
| Biologics Product Expenses | $ 29,637,927 | $ 4,984,779 | $ - | $ 34,622,706 |
| Other Cost of good sold | 208,779 | 208,779 | 83,512 | 501,069 |
| Payroll Expense | 11,203 | 3,867,899 | 4,481 | 3,883,583 |
| Rent Expenses | - | - | 118,474 | 118,474 |
| Admin Expense | 224,772 | 224,772 | 89,909 | 539,453 |
| Insurance Expense | 35,025 | 35,025 | 14,010 | 84,060 |
| Services Cost | 664,300 | 349,300 | 119,720 | 1,133,321 |
| Software Expense | 189,326 | 189,326 | 75,730 | 454,382 |
| Travel Expenses | 134,424 | 134,424 | 53,770 | 322,618 |
| Marketing and Sales Expenses | 47,485 | 47,485 | 18,994 | 113,964 |
| **Total Operating Expenses** | **$ 31,153,241** | **$ 10,041,790** | **$ 578,599** | **$ 41,773,630** |

**Exhibit B**

(Related Individuals)

**Exhibit B – Related Individuals**

Other than the compensation amounts below, the following Related Individuals, as well as their spouses, children, parents and other immediate family members, shall receive no payments from the Debtor, Wound Pros MG, or any entity which receives payments from the Debtor or Wound Pros MG during the term of the Stipulation.

The following individuals may receive payments as compensation for their employment and related employment taxes (if any) in the amounts indicated below:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]