**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GLOBAL WOUND CARE MEDICAL GROUP, a Professional Corporation,[1]<br><br>Debtor and Debtor in Possession. | Chapter 11<br><br>Case No. 24-34908 |

**EMERGENCY MOTION OF 180 HEALTH SERVICES, LLC TO INTERVENE IN CHAPTER 11 CASE PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2018(a)**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**EMERGENCY RELIEF REQUESTED:** 180 Health Services, LLC respectfully requests a hearing on this Motion prior to **Friday, October 2, 2026** (the deadline to file a response to the *Debtor's Motion for Entry of an Order Pursuant to Federal Rule of Bankruptcy Procedure 9019 (I) Authorizing and Approving the Settlement Agreement With the United States and Relator and (II) Granting Related Relief* [Dkt. No. 450]).

[1] The last four digits of the Debtor's tax identification number in the jurisdiction in which it operates are 3572.

180 Health Services, LLC ("**180 Health Services**"), by and through the undersigned counsel, respectfully submits this emergency motion (the "**Motion**") pursuant to Federal Rule of Bankruptcy Procedure 2018(a) (the "**Bankruptcy Rules**") and section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), granting 180 Health Services leave to intervene in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). In support of this Motion, 180 Health Services submits the declaration of Adam Wegner (the "**Wegner Declaration**"), attached hereto as **Exhibit B**, and respectfully states as follows:

## EMERGENCY BASIS

Global Wound Care Medical Group, a Professional Corporation (the "**Debtor**"), filed *Debtor's Motion for Entry of an Order Pursuant to Federal Rule of Bankruptcy Procedure 9019 (I) Authorizing and Approving the Settlement Agreement With the United States and Relator and (II) Granting Related Relief* [Dkt. No. 450] (the "**9019 Motion**") on September 11, 2026, on twenty-one-day negative notice. The deadline to file a response to the 9019 Motion is October 2, 2026. The 9019 Motion seeks approval of a Settlement Agreement (the "**Settlement Agreement**") between the Debtor and the United States that would see the lion's share (over $500 million) of the Debtor's remaining funds paid or payable solely to the United States while leaving a maximum of $500,000 (just 0.1% of the amount contributed to the United States) for the payment of allowed administrative expense, priority, and general unsecured claims, which are significant. If approved, the Settlement Agreement would substantially and negatively impact the interests of 180 Health Services. However, 180 Health Services is not a direct creditor of the Debtor but rather is a creditor of Wound Pros Management Group, Inc. ("**Wound Pros**"), which itself is a significant direct creditor of the Debtor and manages and controls the Debtor pursuant to a Management Services

Agreement.

Emergency consideration of this Motion is necessary before that deadline so that, if intervention is granted, 180 Health Services can timely file and prosecute an objection to the 9019 Motion and the proposed Settlement Agreement. If the Court does not allow 180 Health Services' intervention before the objection deadline, 180 Health Services would be denied an opportunity to present its objection to the 9019 Motion. 180 Health Services would face a direct and material impact on its interests and irreparable harm, as the primary asset and the only source available to Wound Pros to pay its uncontested debt to 180 Health Services is its claim in this Chapter 11 Case.

Should the Settlement Agreement be approved, the estate's assets would be nearly entirely depleted, leaving no chance of a material recovery for administrative expense, priority, or unsecured claimants. In addition, over $15 million of 180 Health Services' claim relates to the postpetition sale of products that were used by the Debtor and, upon information and belief, were reimbursed by the United States but not paid to 180 Health Services. Emergency consideration of 180 Health Services' right to intervene is therefore required so that 180 Health Services may have the benefit of due process and an opportunity to defend and preserve its rights.

## PRELIMINARY STATEMENT

1. On September 11, 2026, the Debtor filed the 9019 Motion seeking approval of a Settlement Agreement with the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services, and the United States Department of Veterans Affairs (collectively, the "**United States**"). The Settlement Agreement would resolve allegations of, *inter alia*, False Claims Act violations, Anti-Kickback Statute violations, Stark Law violations, and improper Medicare billing by the Debtor. Under the Settlement Agreement, the Debtor will pay the United States up

to $525 million, forfeit all suspended Medicare and TRICARE payments totaling more than $316 million, and be excluded from federal healthcare programs for 50 years. Critically, the Settlement Agreement reserves only ***up to*** $500,000 from all estate funds to pay *all* other valid claims—including allowed administrative expense claims, priority claims, and general unsecured claims.

2. 180 Health Services is a provider of human cell and tissue products used in wound care. From June 2023 through October 2025, 180 Health Services sold and provided substantial quantities of products to Wound Pros, the management services organization that managed the Debtor's operations both pre- and post-petition. The products purchased by Wound Pros were used in the Debtor's medical practice to treat patients, and the Debtor received reimbursement payments from federal, state, and private insurance payors for the use of those products. The Debtor in turn sent these reimbursement payments to Wound Pros, where, from at least the time of the Debtor's bankruptcy filing and the Court-approved budget, they were specifically earmarked to pay 180 Health Services' invoices. Wound Pros owes 180 Health Services approximately $26,919,824.69 in principal and accrued interest for products provided but never paid for. Of this amount, $11,377,902.72 ($8,418,174 plus accrued interest of $2,959,728.72) was owed as of October 21, 2024, and the balance of $15,847,558.40 ($11,957,589 plus accrued interest of $3,889,969.40) was incurred post-petition.

3. Wound Pros, in turn, has a scheduled unsecured claim of over $156 million against the Debtor and, upon information and belief, an administrative expense claim of not less than $15 million. 180 Health Services' ability to recover the debt owed to it by Wound Pros is directly correlated to Wound Pros itself recovering these claims from the Debtor.

4. Wound Pros and the Debtor are not independent entities and did not operate at arm's length. Wound Pros managed and effectively controlled the Debtor. Upon information and

belief, William Releford, the owner, chief executive officer, and sole director of Wound Pros, made all key decisions for both companies. Since this Chapter 11 Case commenced, Wound Pros has assured 180 Health Services that it would pay for and protect 180 Health Services' sales to Wound Pros. The Debtor's sole owner and officer was not involved in decisions regarding the Debtor. Wound Pros and the Debtor also operated under a single budget. Upon information and belief, Wound Pros derived very little revenue from any party other than the Debtor.

5. Wound Pros has wound down operations, ceased doing business, and is insolvent. Wound Pros' actions, and inaction in this Chapter 11 Case, have left 180 Health Services unable to rely on Wound Pros to protect the claim that is the principal source of value for Wound Pros and its creditors. 180 Health Services, through its counsel, sent a letter to Wound Pros' counsel on September 14, 2026, demanding that Wound Pros file a substantive objection to the 9019 Motion and protect its claim. The letter set a response deadline of September 17, 2026. As of the date of this filing, no response was received.

6. Since Wound Pros refuses to exercise any of its rights in this bankruptcy case, to the detriment of its own creditors, 180 Health Services seeks to intervene in this Chapter 11 Case pursuant to Bankruptcy Rule 2018(a). Alternatively, if the Court determines general intervention in this bankruptcy case is broader than necessary at this stage, 180 Health Services requests leave to intervene in the contested matter concerning the 9019 Motion, the Settlement Agreement, any objection, discovery, evidentiary hearing, or other proceeding concerning approval, implementation, interpretation, enforcement, or modification of the Settlement Agreement, and any plan, disclosure statement, solicitation procedure, confirmation proceeding, claim-allowance dispute, discovery request, or related proceeding to the extent such matter affects the Settlement Agreement, the $500,000 creditor pool, the United States' asserted superpriority treatment, or

Wound Pros' pre-petition claim and/or post-petition administrative expense claim against the Debtor.

7. As set forth below, all four factors governing intervention under Bankruptcy Rule 2018(a) weigh heavily in favor of granting this Motion and permitting intervention.

**JURISDICTION AND VENUE**

8. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion, this Chapter 11 Case, and the parties affected hereby pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b).

9. Venue for this Chapter 11 Case is proper in the Southern District of Texas pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The predicates for the relief requested herein are sections 105(a) and 1109 of the Bankruptcy Code and rule 2018(a) of the Bankruptcy Rules.

**BACKGROUND**

**A. The Parties**

11. The Debtor is a professional corporation that operated a medical practice providing wound care services primarily to elderly patients receiving Medicare. 9019 Motion ¶ 6. The Debtor was licensed in more than 20 states with over 200 wound care providers treating over 2,000 wounds daily. *Id.* The Debtor suspended operations in December 2025. *Id.* ¶ 16.

12. Wound Pros and the Debtor are substantially related entities with deeply intertwined operations. Wound Pros is the management services organization that managed the Debtor both pre- and post-petition pursuant to a Management Services Agreement. *Id.* ¶ 7. Wound Pros handled the Debtor's non-clinical, administrative, and business operations, including billing and collections, legal and regulatory compliance, and administrative and infrastructure support. *Id.* Wound Pros has a scheduled unsecured claim against the Debtor in the approximate amount of

$156,816,443.86. *See Schedule of Assets and Liabilities for Global Wound Care Medical Group, A Professional Corporation (Case No. 24-34908 CML)* [Dkt. No. 75] ("**Schedules**") at p. 27. Upon information and belief, Wound Pros also has a sizable administrative expense claim of not less than $15 million—for products supplied by 180 Health Services to Wound Pros and in turn sold to and used by the Debtor post-petition—that it has not asserted in the Chapter 11 Case. Wegner Decl. ¶ 12.

13. Upon information and belief, Releford—the sole owner, director, and chief executive officer of Wound Pros—made all key decisions for both companies and was actively involved and knowledgeable of all operational activities. *Id.* ¶ 15. The Debtor's sole owner and officer was not involved in the Debtor's decisions. *Id.* The two companies operated under a single budget. *Id.* The Debtor used products supplied through Wound Pros to treat patients and generate Medicare, Medicaid, and other reimbursement claims, and the resulting reimbursement funds were routed through the Debtor to Wound Pros. *Id.* Upon information and belief, in the months leading up to the Petition Date and after the Petition Date, Wound Pros derived very little revenue from any party other than the Debtor. *Id.*

14. 180 Health Services is a provider of human cell and tissue products used in wound care. Wegner Decl. ¶ 5. 180 Health Services' products provided to the Debtor, via Wound Pros, generated substantial value for the Debtor's estate, as these were the very products used by the Debtor to provide potentially life-saving treatment to patients and generate the reimbursement proceeds, including from Medicare, TRICARE, and other payors, that makes up the value of the Debtor's estate. *Id.*

**B. <u>The Contractual Relationship and Outstanding Debt</u>**

15. On or about July 1, 2024, 180 Health Services and Wound Pros entered into a

Fulfillment Agreement, which amended and restated prior agreements (the "**Fulfillment Agreement**"). A true and correct copy of the Fulfillment Agreement is attached to the Wegner Declaration as **Exhibit 1**. Under the Fulfillment Agreement, 180 Health Services agreed to sell human cell and tissue wound care products to Wound Pros, and Wound Pros agreed to pay the balance due for each invoice within seventy-five (75) days of the invoice date. Fulfillment Agreement § 4. Any unpaid balances bear interest at the rate of 1.5% per month. *Id.*

16. From June 2023 through October 2025, 180 Health Services sold and provided substantial quantities of its products to Wound Pros. Wegner Decl. ¶ 7. For almost every month during this period, Wound Pros was 180 Health Services' largest customer. *Id.* The products purchased by Wound Pros were used in the medical practice of the Debtor, which was managed by Wound Pros, to treat the Debtor's patients, and the Debtor received reimbursement payments from federal, state, and private insurance payors for the use of those products. *Id.*

17. Despite accepting the products and providing them for use by the Debtor, Wound Pros fell behind on its payments. By October 2025, Wound Pros' past-due invoices totaled $20,375,763.00 in principal. *Id.* ¶ 8.

18. On March 6, 2026, Wound Pros' head of finance, Stephen H. Weyler, signed an AR Confirmation Letter confirming the outstanding principal balance of $20,375,763 as of December 31, 2025. A true and correct copy of the AR Confirmation Letter is attached to the Wegner Declaration as **Exhibit 2**.

19. As of June 19, 2026, Wound Pros owes 180 Health Services a total of no less than $26,919,824.69. Wegner Decl. ¶ 10. Of this amount, $11,377,902.72 ($8,418,174 plus accrued interest of $2,959,728.72) was owed as of October 21, 2024, and the balance of $15,847,558.40 ($11,957,589 plus accrued interest of $3,889,969.40) was incurred post-petition. *Id.* Interest

continues to accrue at a rate of approximately $300,000 each month. *Id.*

20. On June 4, 2026, 180 Health Services filed a complaint against Wound Pros in the Superior Court of California, Orange County, asserting claims for: (1) Breach of Contract; (2) Account Stated; (3) Unjust Enrichment; and (4) Violation of Cal. Bus. & Prof. Code § 17200. *See 180 Health Services, LLC v. Wound Pros Management Group, Inc. et al*., Case No. 30-2026-01576233-CU-BC-CJC. Because Wound Pros failed to respond to the complaint, on July 29, 2026, the clerk entered default, which cut off Wound Pros' ability to respond to the complaint or participate in the litigation absent relief. Wegner Decl. ¶ 11. The default judgment in the amount of $26,003,990.86 is currently pending and has not yet been entered by the court. *Id.*

21. On September 14, 2026, 180 Health Services sent a detailed letter (the "**Demand Letter**") to Joshua M. Mester, counsel for Wound Pros, demanding that Wound Pros file and prosecute a substantive objection to the 9019 Motion or provide a concrete plan to preserve its response rights through October 2, 2026. The Demand Letter identified specific grounds for objection, including that the $500,000 cap provides no meaningful benefit to non-government creditors, that the Settlement Agreement improperly elevates the United States' claim, and that the Anti-Objection Provision is coercive and deprives Wound Pros of due process. The Demand Letter warned that, if Wound Pros failed to act, 180 Health Services would seek expedited participation under Bankruptcy Rule 2018. No substantive response was received from Wound Pros or its counsel. A true and correct copy of the Demand Letter is attached to the Wegner Declaration as **<u>Exhibit 3</u>**.

22. Upon information and belief, Wound Pros has wound down operations, ceased doing business, and is insolvent. Wound Pros' actions, and inaction in pursuing its claims in this Chapter 11 Case, have left 180 Health Services unable to rely on Wound Pros to protect the claim

that is the principal source of value for Wound Pros and its creditors. Wegner Decl. ¶ 12.

23. It has been made abundantly clear to 180 Health Services that Wound Pros does not intend to advocate for its interests or those of its creditors, and so 180 Health Services is exploring all available options to protect its own interests. These options include seeking the appointment of a receiver or other independent fiduciary to take control of Wound Pros and pursue its claims against the Debtor or filing an involuntary chapter 7 petition against Wound Pros so that a chapter 7 trustee may be appointed to pursue Wound Pros' claims and maximize recovery for its creditors. However, these options take time that, with the 9019 Motion's objection deadline rapidly approaching, 180 Health Services does not have.

24. 180 Health Services attempted in good faith to have Wound Pros protect its own rights and interests and, in turn, the rights and interests of 180 Health Services and its other creditors. Having been met with silence, 180 Health Services now seeks this intervention.

### C. <u>The Debtor's Bankruptcy and Relationship with Wound Pros and 180 Health Services</u>

25. On October 21, 2024 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

26. The Debtor used 180 Health Services' products, purchased by the Debtor via Wound Pros, in the treatment of its patients, and the Debtor received and continues to receive payments for the use of those products. *See Declaration of Ralph Cetrulo in Support of Chapter 11 Petition and First Day Motions* [Dkt. No. 8] ("**Cetrulo Declaration**") ¶¶ 16–18; Payment Suspension Stipulation [Dkt. No. 87] ¶ 5(f) (stating that the Debtor "specifically represents and warrants that none of the interests described in this paragraph . . . exists with regard to its suppliers of biologic materials, including 180 Health Services, Biowounds, and Accesso"). Accordingly, 180 Health Services' products, though received by the Debtor indirectly from 180 Health Services,

have provided significant value to the Debtor's estate.

**D. <u>The 9019 Motion and the Settlement Agreement</u>**

27. On September 11, 2026, the Debtor filed the 9019 Motion seeking approval of the Settlement Agreement with the United States, as defined therein, and a Relator. The Debtor admits and acknowledges that the "Covered Conduct" at issue—including False Claims Act violations, Anti-Kickback Statute violations, Stark Law violations, improper "incident to" billing, biologic incentive fee payments to independent contractor clinicians, and fraudulent Medicare enrollment—occurred. Settlement Agreement at p. 7.

28. The key terms of the Settlement Agreement include, among others:

a) The Debtor will pay the United States up to $525 million (the "**Settlement Amount**");
b) The Debtor forfeits all suspended Medicare and TRICARE payments, totaling more than $316 million;
c) The United States receives an allowed, nondischargeable, super-priority claim for any unpaid balance of the Settlement Amount;
d) CMS will rescind extrapolated overpayments totaling $1,130,283,438.89;
e) The Debtor will be excluded from federal healthcare programs for 50 years; and
f) The Debtor retains only up to $500,000 from funds otherwise payable to the United States to pay all other valid claims—including administrative expense claims, allowed priority prepetition claims, and allowed general unsecured claims.

Settlement Agreement ¶¶ 1, 13, 20.

29. Critically, "no payment may be made to Wound Pros or any owner, affiliate, employee or operator thereof if they object to this Settlement or fail to vote in favor of confirmation of the Plan." Settlement Agreement ¶ 20.1 (the "**Anti-Objection Provision**").

30. The 9019 Motion contains scant evidentiary support, and what minimal support it includes is conclusory and self-serving. The 9019 Motion provides no liquidation analysis, no recovery waterfall, no support for the $500,000 sum to be set aside for all creditors other than the

United States or any indication as to how this figure was reached, no discussion or analysis of the amount of administrative expense claims there are or may be against the estate, and no detailed factual or legal support for granting the United States's claim superpriority status over all other claims. Furthermore, the United States has not even filed a proof of claim in the Chapter 11 Case, thus leaving creditors with no means to analyze the validity or amount of the United States's claim other than the conclusory and self-serving statements contained in the 9019 Motion.

31. Per the proposed Settlement Agreement, the Debtor must file a Solicitation Package (disclosure statement and plan) no later than October 15, 2026. Settlement Agreement ¶ 18(b). As proposed, the Settlement Agreement essentially dictates the terms of the Debtor's plan and the treatment of all claims thereunder before creditors can be provided with a meaningful opportunity to assess the plan. However, the 9019 Motion provides no explanation as to how such a plan would even be feasible given that only $500,000 would remain to pay all remaining creditors, including those with administrative expense claims that must be paid in full upon the effective date of the plan. Given that, upon information and belief, Wound Pros has an administrative expense claim of not less than $15 million, payment in full of administrative expenses on the effective date is an impossibility. The Settlement Agreement thus serves to force the Debtor down a path to a patently unconfirmable plan.

## RELIEF REQUESTED

32. 180 Health Services seeks entry of an order, substantially in the form attached hereto as **Exhibit A**, granting 180 Health Services leave to intervene in the Chapter 11 Case. In the alternative, should the Court determine that a general intervention is broader than necessary at this stage, 180 Health Services requests leave to intervene in the contested matter relating to the Debtor's Rule 9019 Motion, the Settlement Agreement, any objection, discovery, evidentiary

hearing, or other proceeding concerning approval, implementation, interpretation, enforcement, or modification of the Settlement Agreement, and any plan, disclosure statement, solicitation procedure, confirmation proceeding, claim-allowance dispute, discovery request, or related proceeding to the extent such matter affects the Settlement Agreement, the $500,000 creditor pool (or other sum proposed to be used for the purpose of paying administrative, priority, and/or unsecured creditors), the United States' asserted superpriority treatment, or Wound Pros' claim against the Debtor.

## BASIS FOR RELIEF

### A. 180 Health Services Should Be Permitted to Intervene in Proceedings Related to the 9019 Motion

33. Under Rule 2018(a) of the Bankruptcy Rules, "[a]fter hearing on such notice as the court orders and for cause, the court may permit an interested entity to intervene generally or in any specified matter." FED. R. BANKR. P. 2018(a).

34. Intervention in a case under chapter 11 of the Bankruptcy Code is governed by Rule 2018. *Rollert Co., Inc. v. In re Charter Co.*, 50 B.R. 57, 61 (Bankr. W.D. Tex. 1985) ("[I]ntervention in an adversary proceeding is governed by Bankruptcy Rule 7024 and intervention in a case under the Code is governed by Bankruptcy Rule 2018.").

35. The factors that this Court should consider in determining whether to permit 180 Health Services' intervention are: (i) whether 180 Health Services has an economic or similar interest in the issue; (ii) whether intervention is necessary to protect the interest; (iii) whether 180 Health Services' interests are adequately represented; and (iv) whether intervention would unduly delay the proceedings. *See In re Adilace Holdings, Inc.*, 548 B.R. 458, 462-63 (Bankr. W.D. Tex. 2016) (collecting cases); *Neutra, Ltd. v. Terry (In re Acis Cap. Mgmt., L.P.)*, 604 B.R. 484, 513 (N.D. Tex. 2019) (quoting *Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md.

Sept. 23, 2014)).

36. The Court's decision on whether to grant a motion to intervene "is wholly discretionary under Rule 2018 and under FRCP 24(b), even where each required element is met." *In re Adilace Holdings, Inc.*, 548 B.R. at 463 (citing *Staley v. Harris Cnty. Tex.*, 160 F. App'x. 410, 414 (5th Cir. 2005); *In re Durango Ga. Paper Co*., 336 B.R. 594, 596 (Bankr. S.D. Ga. 2005)). Here, all four factors weigh heavily in favor of granting this Motion.

**1. <u>180 Health Services Has a Substantial Economic Interest in the Outcome of the 9019 Motion.</u>**

37. First, 180 Health Services has a direct and substantial economic interest in the 9019 Motion.

38. Although 180 Health Services does not have a direct creditor-debtor relationship with the Debtor, 180 Health Services holds claims against Wound Pros—the Debtor's management-services organization—exceeding $26 million for products that were provided to and used by the Debtor in treating patients and generating Medicare reimbursements. There is no question that 180 Health Services' products were used by the Debtor. Payment Suspension Stipulation ¶ 5(f) (stating that the Debtor "specifically represents and warrants that none of the interests described in this paragraph . . . exists with regard to its suppliers of biologic materials, including 180 Health Services . . .").

39. Wound Pros is insolvent and has wound down its operations, and, based on representations made by Wound Pros, its primary potential source of funds to repay its own creditors is its claim against the Debtor. *See* Wegner Decl. ¶ 12. Wound Pros has a non-contingent, liquidated, and undisputed scheduled unsecured claim against the Debtor in the amount of $156,816,443.86. Schedules at p. 27. Further, upon information and belief, Wound Pros may also have an administrative expense claim of not less than $15 million (for products supplied by 180

Health Services to Wound Pros and subsequently sold to and used by the Debtor), which it has not yet asserted in the Chapter 11 Case. Thus, if 180 Health Services is to have any hope of recovering the debt owed to it by Wound Pros, it must be through Wound Pros' own recovery of the debt owed to it by the Debtor.

40. However, the Settlement Agreement proposes to forfeit substantially all of the Debtor's assets to the United States, leaving only ***up to*** $500,000 to satisfy all other creditors. This is not nearly sufficient to satisfy Wound Pros' unsecured claim against the Debtor, let alone its potential $15 million administrative expense claim. Even assuming Wound Pros recovers most of the $500,000 creditor fund, any amount of that recovery that might make its way to 180 Health Services would simply be a drop in the bucket in relation to the approximately $26,919,824.69 owed to 180 Health Services by Wound Pros.

41. 180 Health Services thus has a substantial economic interest in the outcome of the 9019 Motion, and this first factor weighs in favor of permitting intervention.

**2. 180 Health Services' Interests Are Not Adequately Represented in the Settlement Agreement.**

42. Second, 180 Health Services' interests are not adequately represented by any existing party.

43. 180 Health Services' interests are entirely dependent on Wound Pros, but it cannot rely on Wound Pros to advocate for its own interests or for the interests of its creditors. On September 14, 2026, shortly after the Debtor filed the 9019 Motion, 180 Health Services sent a Demand Letter to Wound Pros demanding that Wound Pros file a substantive objection to the 9019 Motion by the October 2 deadline and that Wound Pros confirm that it will do so by September 17, 2026. Wound Pros provided no such confirmation (nor a response of any kind), and it is readily apparent to 180 Health Services that Wound Pros has no inclination to take any further action in

this Chapter 11 Case.

44. Even if Wound Pros were inclined to object to the 9019 Motion, it cannot do so without forfeiting its right to any recovery. The Settlement Agreement includes a death trap for Wound Pros in the form of the Anti-Objection Provision, which prohibits Wound Pros from receiving any payment whatsoever if it objects to the Settlement Agreement or fails to vote in favor of confirmation of the plan. *See* Settlement Agreement ¶ 20.i. Wound Pros thus cannot be expected to advocate for 180 Health Services' interests and, in fact, cannot do so without jeopardizing 180 Health Services' own means of recovery.

45. Further, Wound Pros and the Debtor are substantially related entities. *See* Cetrulo Declaration ¶ 1 ("I am the [CFO] of Global Wound Care Medical Group, a Professional Corporation, the debtor and debtor in possession in the above-captioned case (the 'Debtor'). Additionally, in my role at the Debtor's management company, Wound Pros . . . I provided consultant services to the Debtor beginning in March 2023."). Undoubtedly, this blatant conflict of interest is the reason behind the Anti-Objection Provision in the Settlement Agreement, but it also provides additional evidence that 180 Health Services cannot rely on Wound Pros to act in good faith to protect its creditors' interests.

46. Notwithstanding the Anti-Objection Provision and this conflict of interest, Wound Pros has not actively protected its own interests throughout this Chapter 11 Case. Wound Pros has not sought to recover any of its $156,816,443.86 pre-petition claim nor any post-petition administrative claim in the nearly two years since this case has been pending. Wound Pros' inactivity in the Debtor's bankruptcy case demonstrates Wound Pros has no interest in seeking to recover from the Debtor and seemingly has no intention to pay its own creditors.

47. Wound Pros' inaction and the conflicts of interest described above underscores the

need for intervention, as no party is positioned to advocate for the interests of entities like 180 Health Services that supplied products ultimately used by the Debtor.

**3. <u>Intervention Will Not Cause Undue Delay</u>**

48. Third, 180 Health Services' intervention will not delay the proceedings. The 9019 Motion was filed only recently, on September 11, 2026, and this bankruptcy case has been pending for nearly two years. Furthermore, 180 Health Services seeks to intervene on an emergency basis so that it may file a timely objection to the 9019 Motion within the twenty-one-day negative-notice period that is required by local rule. 180 Health Services is not seeking to expand the scope of the proceedings, but simply to be heard in connection with a matter that directly and materially affects its rights. Any delay caused by providing 180 Health Services with an opportunity to be heard on the 9019 Motion and Settlement Agreement would be minimal, especially considering this bankruptcy case has been pending for nearly two years with virtually no significant activity, and would comport with typical timelines for motions of this nature.

49. Allowing 180 Health Services to participate in the proceedings on the 9019 Motion will promote efficiency and ensure that all affected parties have an opportunity to be heard.

**4. <u>Denial of Intervention Would Adversely Affect 180 Health Services' Interests</u>**

50. Fourth, the final factor weighs in favor of allowing intervention, as denial of this Motion would impair 180 Health Services' significant interest in the disposition of the Debtor's assets.

51. Without intervention, 180 Health Services will have no voice in a settlement that effectively disposes of nearly all estate assets and would eliminate any hope of 180 Health Services' recovery from a creditor that is closely related to the Debtor and controlled all aspects of the Debtor's operations. The $500,000 creditor pool is wholly inadequate to satisfy the claims

of creditors in this case, including Wound Pros' claims, and consequently amounts owed to 180 Health Services.

52. Further, "the court should approve the settlement only when the settlement is fair and equitable and in the best interest of the estate." *Conn. Gen. Life Ins. Co. v. United Co. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (citing *Jackson Brewing Co.*, 624 F.2d at 602; *U.S. v. AWECO (In re AWECO)*, 725 F.2d 293, 298 (5th Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984)). Given Wound Pros' inaction and inability to object under the Settlement Agreement, which raises due-process concerns in and of itself, due process would be served by hearing 180 Health Services' views and concerns related to the fairness and equitability of the Settlement Agreement and whether it is in the best interest of the estate.

53. The United States has not filed a proof of claim in this case and has until October 15, 2026, to do so. *See* Stipulation and Order Extending the Proof of Claim Deadline for the United States [Dkt. No. 452]. Additionally, under the terms of the Settlement Agreement, a proposed plan is not due until October 15, 2026—after the October 2, 2026 deadline to object to the 9019 Motion. As a result, creditors and the Court cannot fully evaluate the nature and extent of the government's claims against the Debtor or assess the reasonableness of the proposed Settlement Agreement. This sequencing asks creditors to evaluate and potentially acquiesce to a settlement that will dictate the terms of any future plan before they have an opportunity to review or object to the plan itself.

54. Without transparency into the government's claims and the contours of the forthcoming plan, creditors cannot meaningfully assess whether the Settlement Agreement is fair and equitable or in the best interest of the estate.

55. Approving the Settlement Agreement risks causing greater delay and disruption to these proceedings than permitting 180 Health Services to intervene now. Specifically, the

Settlement Agreement reserves only up to $500,000 to pay all administrative expense claims, allowed priority prepetition claims, and allowed general unsecured claims. Given the magnitude of the claims in this case—including Wound Pros' claim of approximately $156.8 million and a potential $15 million administrative expense claim—this set-aside raises serious questions about the feasibility of any proposed plan of reorganization.

56. As proposed, the Settlement Agreement essentially functions as an impermissible *sub rosa* plan. Courts in the Fifth Circuit consider the following factors for deciding whether an agreement amounts to a *sub rosa* plan: (i) whether the agreement has the practical effect of dictating some of the terms of any future reorganization plan, (ii) whether the agreement requires creditors to vote in favor of any future reorganization plan or otherwise infringes upon creditors' voting rights, and (iii) whether the agreement disposes of virtually all assets of the estate and leaves little prospect or occasion for future reorganization. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 355 (5th Cir. 1997) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)) (discussing the factors for determining whether an agreement is a *sub rosa* plan). Here, each of the three factors is met.

57. First, the Settlement Agreement as proposed dictates the terms of the Debtor's plan and the treatment of all claims thereunder before creditors can be provided with a meaningful opportunity to assess the plan. The United States will be given the lion's share of the Debtor's remaining assets in partial payment of its claim (for which it has not yet submitted a proof of claim nor provided any evidence) and will be granted a non-dischargeable super-priority claim for the balance. All that will remain is a maximum of $500,000 to be distributed amongst the Debtor's remaining creditors—including administrative, priority, and general unsecured claimants.

58. Second, the Settlement Agreement explicitly prohibits Wound Pros from failing to vote in favor of confirmation of the plan or it forfeits any payment on its claims.

59. Third, as noted above, the Settlement Agreement would dispose of all assets of the Debtor save for a maximum of $500,000 to be distributed amongst all creditors other than the United States. Given that, upon information and belief, Wound Pros has an administrative expense claim of not less than $15 million, payment in full of administrative expenses on the effective date is an impossibility. The Settlement Agreement thus serves to force the Debtor down a path to a patently unconfirmable plan and leaves no prospect of future reorganization.

60. If the Settlement Agreement is approved and a later-proposed plan proves infeasible because administrative expense claims cannot be paid in full, the result would be further litigation, potential plan objections, significant additional delay, and likely dismissal of this case. Those consequences could be avoided by allowing 180 Health Services to raise its concerns now.

**NOTICE**

49. 180 Health Services will provide notice of this Motion to: (a) the Debtor and its counsel; (b) the Office of the United States Trustee; (c) counsel to the United States; (d) any Official Committee of Unsecured Creditors appointed in this case and its counsel; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1. Should the Court schedule an emergency hearing on this Motion, 180 Health Services will promptly provide actual notice of the hearing to the parties listed above. In light of the nature of the relief requested, no other or further notice need be provided.

WHEREFORE, 180 Health Services respectfully requests that the Court enter the Order granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

Dated: September 25, 2026

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

*/s/ Nicholas R. Miller*
Tyler N. Layne (Fed. Bar No. 2639086)
Symphony Place
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Tel.: (615) 850-8159
Fax: (615) 244-6804
E-mail: Tyler.Layne@hklaw.com

-- and --

Nicholas R. Miller (Tex. Bar No. 24125328)
Heather C. Montoya (Tex Bar No. 24137060)
98 San Jacinto Blvd., Suite 1900
Austin, Texas 78701
Tel.: (512) 685-6457
Fax: (512) 472-7473
E-mail: Nick.Miller@hklaw.com
Heather.Montoya@hklaw.com

*Attorneys for 180 Health Services, LLC*

## CERTIFICATE OF ACCURACY

Pursuant to Bankruptcy Local Rule 9013-1(i), the undersigned certifies that the factual statements contained in this Emergency Motion regarding the existence of the emergency and the need for expedited consideration are true and correct to the best of the undersigned's knowledge, information, and belief after reasonable inquiry.

Dated: September 25, 2026

*/s/ Nicholas R. Miller*
Nicholas R. Miller

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed with the Clerk of Court via the CM/ECF system which will provide automatic electronic notification of such filing upon all counsel and parties of record registered to receive notice thereby.

Dated: September 25, 2026

*/s/ Nicholas R. Miller*
Nicholas R. Miller